STATE OF NORTH CAROLINA v. TRAVIS K. McCORD AKA SHAWN LATTIMORE

No. COA99-1349

(Filed 5 December 2000)

**1. Jury— peremptory challenge—*Batson* claim—race-neutral reasons**

The trial court did not err in a prosecution for first-degree murder, first-degree rape, first-degree kidnapping, robbery with a

firearm, and first-degree burglary by concluding the State properly exercised its peremptory challenges without relation to race to exclude two prospective black jurors because: (1) the State offered race-neutral reasons for excusing one prospective juror that he did not own his own home, he had not lived at his residence for more than five years, and he knew a codefendant; (2) the State offered race-neutral reasons for excusing the other prospective juror that she knew the codefendant and she had previously been charged with aiding and abetting a murder; (3) the record contains no evidence the State made any racially motivated statements or asked any racially motivated questions during voir dire, and the record shows one black juror served on the panel; and (4) defendant did not offer any evidence tending to show racial discrimination by the State in the use of its peremptory challenges.

## 2. Jury— peremptory challenge—*Batson* claim—prima facie showing of intentional discrimination

The trial court's finding that defendant did not make a prima facie showing of intentional discrimination in a prosecution for first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary is clearly erroneous and the case is remanded to the trial court to provide the State the opportunity to give a race-neutral reason for striking two black potential jurors, because: (1) the record shows the victim was white and defendant is black; (2) the State used its peremptory challenges to excuse four of the six black jurors in the jury pool; and (3) the composition of the jury panel was eleven white jurors and one black juror.

## 3. Search and Seizure— warrant—sworn application

The trial court did not err by denying defendant's motion to suppress evidence obtained as a result of a search warrant even though the application for the search warrant itself did not state on its face that it was sworn, because: (1) the trial court found that the detective was sworn by the judge and made the application for the search warrant with attachments under oath as required by N.C.G.S. § 15A-244; and (2) this finding of fact is supported by the detective's testimony during voir dire that she signed the application in the judge's presence after being sworn by the judge.

**4. Evidence— hearsay—not truth of matter asserted—limiting instruction—not substantially outweighed by danger of unfair prejudice**

The trial court did not err in a prosecution for first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary by concluding that an accomplice's testimony regarding statements made by the victim to one of the other accomplices, that the victim's boyfriend was in motel room 109 and he had drugs and a lot of money, was not inadmissible hearsay or inadmissible under N.C.G.S. § 8C-1, Rule 403, because: (1) the State did not offer testimony of the victim's statement for the truth of the statement, but offered the testimony to show what the accomplice did based on the victim's statement; (2) the trial court gave the jury a limiting instruction that the evidence of the victim's statement was offered for that limited purpose; and (3) defendant does not argue in his brief how the probative value of this testimony would be substantially outweighed by the danger of unfair prejudice, and the record reveals no danger of unfair prejudice under Rule 403.

**5. Evidence— prior statement—corroboration of trial testimony**

The trial court did not err in a prosecution for first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary by admitting into evidence an accomplice's prior statement to an officer to corroborate her trial testimony, because; (1) the variations in the accomplice's testimony at trial do not directly contradict her statement given to the officer; and (2) the information in the statement was substantially similar to and tended to strengthen and confirm her testimony at trial regarding the events leading up to the victim's shooting.

**6. Criminal Law— State's method of questioning—trial court's discretion**

The trial court did not err in a prosecution for first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary by allowing the State to read lines of an accomplice's statement and then ask her whether the line was correct, because: (1) the method of questioning allowed at trial was within the discretion of the trial court; and (2) there was no showing of a manifest abuse of discretion.

**7. Evidence— accomplice's plea agreement and plea transcript—agreement to testify against defendant—relevant to credibility**

The trial court did not err in a prosecution for first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary by admitting evidence of an accomplice's plea agreement and plea transcript under N.C.G.S. § 8C-1, Rule 401, because the fact that the accomplice entered into a plea agreement with the State in which she agreed to testify against defendant was relevant to the accomplice's credibility.

**8. Evidence— expert testimony—reliability of scientific methods—hair comparisons—shell casings**

The trial court did not err in a prosecution for first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary by admitting testimony of an expert in the field of hair and fiber analysis regarding hair comparisons and testimony of an expert in firearms and tool mark examination regarding shell casings even though defendant contends there was no proper foundation to show the reliability of the scientific methods, because: (1) although the trial court did not specifically find the comparison of hair samples is reliable scientific methodology, this finding was implicit in the trial court's overruling of defendant's objection to this testimony, and the comparison of hair samples has been accepted as reliable scientific methodology in this State; and (2) although the trial court did not specifically find the comparison of shell casings is reliable scientific methodology, this finding was implicit in the trial court's overruling of defendant's objection to this testimony, and the comparison of bullets and weapons has been accepted as reliable scientific methodology in this State.

**9. Evidence— expert testimony—procedure used by SBI to conduct DNA tests—testing performed by another individual—information inherently reliable**

The trial court did not err in a prosecution for first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary by allowing an expert in DNA testing to testify regarding a report he did not prepare showing the procedure used by the SBI to conduct DNA tests even though the testing was performed by another individual, because the

information contained in the file was inherently reliable based on the fact that the expert worked with the individual at the SBI and reviewed the file in this case by specifically doing a technical review of the individual's work on the file.

**10. Evidence— expert opinion—validity of DNA testing report—no expression of opinion by trial court**

The trial court did not improperly express its opinion as to the validity of a DNA testing report in a prosecution for first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary when it asked an expert in DNA testing who did not perform the pertinent test whether his testimony was his opinion as to the results of the testing, because the trial court merely asked whether the expert was stating an opinion based on the report instead of expressing an opinion on whether the report was valid or credible.

**11. Witnesses— expert—qualifications—DNA analysis**

The trial court did not commit prejudicial error in a prosecution for first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary by instructing the jury that a witness would be allowed to testify as an expert in the field of DNA analysis if the jury finds her to be so qualified, because: (1) the record shows the witness was qualified as an expert in the field of DNA analysis and the trial court permitted the witness to give expert testimony in this field; and (2) even if the statement was error, it was harmless in light of the witness's qualifications, the trial court's conviction that the witness was an expert, and the fact the witness's opinion testimony fit within the definition of expert testimony.

**12. Evidence— flight—disclosure of separate crime admissible—evidence of guilt or consciousness of guilt**

The trial court did not err in a prosecution for first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary by allowing evidence under N.C.G.S. § 8C-1, Rule 404(b) of defendant's flight from an officer, including evidence that defendant fired a weapon at officers and defendant was hit with a bullet fired by one of the officers, because: (1) evidence of a defendant's flight following the commission of a crime may properly be considered by a jury as evidence of guilt or consciousness of guilt; (2) evidence of flight is admissible even though it may disclose the commission of a sep-

arate crime by defendant; and (3) the trial court's determination that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice to defendant under N.C.G.S. § 8C-1, Rule 403 was not an abuse of discretion.

Appeal by defendant from judgments dated 7 April 1999 by Judge Steve A. Balog in Cleveland County Superior Court. Heard in the Court of Appeals 11 October 2000.

*Attorney General Michael F. Easley, by Assistant Attorney General John F. Maddrey, for the State.*

*Julian B. Wray for defendant-appellant.*

GREENE, Judge.

Travis K. McCord AKA Shawn Lattimore (Defendant) appeals judgments finding him guilty of first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary.

### Jury selection

The record shows Defendant is black and the victim was white. The initial prospective panel of jurors to be questioned during *voir dire* consisted of ten white jurors and two black jurors. The two black jurors on the panel were Loretta Clemmons (Clemmons) and Vernon Pressley (Pressley). Subsequent to its questioning of the panel, the State excused Clemmons and Pressley. Defendant objected to the State excusing these two jurors on the ground "[t]here is no legitimate reason for dismissal by the State of the two blacks on the jury except to try to get all white jurors to sit and hear this matter." Prior to determining whether Defendant had stated a *prima facie* case of intentional discrimination under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986), the trial court allowed the State to argue legitimate non-discriminatory reasons existed for excusing these jurors. The State argued it excused Pressley because he did not own his own home, he had not lived in his residence for more than five years, and he knew a co-defendant. Also, the State argued it excused Clemmons because she knew a co-defendant and she previously had been charged with aiding and abetting a murder. The trial court then found:

[T]here is not a sufficient pattern shown at this time to indicate that [Pressley and Clemmons] were excluded and excused for

any improper purposes, and that therefore, although the State is not required at this point to state reasons why the peremptory challenge was exercised as to each, I do find that the stated reasons by the [State] were . . . legitimate grounds to exercise peremptory challenge not related to race.

The trial court subsequently denied Defendant's *Batson* motion and the parties continued to question additional prospective jurors.

Later during *voir dire*, the State excused two black jurors, Itaska White (White) and Patricia Hartgrove (Hartgrove). Defendant objected to the State excusing these jurors, and the trial court noted the objection and indicated it would allow Defendant to make an argument regarding the objection at a later point in the proceedings. The parties, therefore, continued with *voir dire*. When the *voir dire* proceedings were complete, the trial court allowed Defendant to raise his objection to the State excusing White and Hartgrove. Defendant argued these jurors were excused "for no apparent reason, other than . . . that they were black." Defendant argued the State had exhibited "a pattern [of] taking all . . . blacks off of the jury." The trial court overruled Defendant's objection, finding there had not been "any pattern of ra[cial] discrimination in the exercise of peremptory challenge by the [State]." The trial court noted, regarding the racial composition of the jury, that the jury had eleven white members and one black member. The trial court also noted that one other black juror had been in the jury pool, but that juror was excused for cause. Subsequent to the trial court's ruling, Defendant asked the trial court to "make inquiry as required by *Batson*" regarding the State's use of its peremptory challenges. In response to Defendant's request, the trial court stated: "I do not find that there has been any . . . prima facie showing of any pattern of racial discrimination" by the State.

*Trial*

The State presented evidence at trial that on 8 February 1997, Katina Lankford (Lankford) and Amy Sigmon (Sigmon) rented a room at the Governors Inn, a motel located near Shelby, North Carolina. Lankford testified that she and Sigmon were joined at the motel by Marquette Ruff (Ruff) and a man named "Zeek." The four parties got "high" on marijuana and Xanax and spent the night in the motel room. On the following day, Lankford and Sigmon took Ruff and Zeek to another location, and Lankford and Sigmon returned to the Governors Inn and rented room 108 for the evening. After smoking marijuana and "rid[ing] around," Lankford and Sigmon returned to

room 108 and were joined by Lamont Haynes (Haynes) and a man Lankford knew as "Lamar." The parties remained in the room for approximately one hour and smoked marijuana, and then Haynes left the room to go to room 109 of the motel. Lankford testified Haynes went to room 109 because he had seen a woman he knew named Krista Byers (Byers) go into the room. Sometime later, Haynes returned to room 108 accompanied by Byers. Byers was staying "with a drug dealer in room 109 that [Haynes] knew" named Frankie Roseboro (Roseboro). Haynes wanted to go to room 109 to purchase cocaine from Roseboro; however, Byers told Haynes that he could not go to room 109 at that time.

Defendant objected at trial to the admission into evidence of statements made by Byers to Haynes on the ground the evidence was hearsay. The trial court held a *voir dire*, and the State argued it was not offering the testimony to prove the truth of what Byers said to Haynes; rather, the evidence was offered "to show what Lankford did" after hearing Byers' statement. Lankford testified on *voir dire* that Byers told Haynes "the weight of the drugs and the money that . . . Roseboro had in room 109." Lankford then relayed this information to Sigmon, who was talking on the telephone with Ruff at that time. The State argued it intended to offer this evidence to show that Lankford told Sigmon that Byers said room 109 contained drugs and money. The trial court ruled the testimony was not hearsay and was, therefore, admissible. Defendant then objected to the evidence on the ground "its probative value does not outweigh the undue prejudice to [Defendant]," pursuant to Rule 403 of the North Carolina Rules of Evidence. In response, the trial court found the evidence was relevant and "that its probative value is not outweighed by any undue prejudice to . . . [D]efendant, and it is therefore admissible."

Subsequent to its ruling, the trial court gave the following limiting instruction: "[Lankford's] testimony about statements by . . . Byers, [is] not offered for the truth of the content of . . . Byers' statements, but [is] offered as—to the fact that the statement was made and the content of the statement itself. And its use is limited for that purpose." Lankford then continued to testify regarding the events that took place at the Governors Inn on 9 February 1997. She testified that Sigmon was talking on the telephone with Ruff. While Sigmon was still on the telephone, Byers told Haynes that "Roseboro was in 109, and he had [drugs] and a lot of money." Lankford then told Sigmon to tell Ruff that "in room 109 there was money and drugs." Haynes, Lamar, and Byers subsequently left the motel room, and

Lankford and Sigmon discussed robbing Roseboro. Lankford and Sigmon then also left the motel room and went in Sigmon's vehicle to pick up Ruff.

After Lankford and Sigmon picked up Ruff, they had a discussion about their intended robbery and decided to pick up Defendant. After Defendant got into the vehicle, Lankford, Sigmon, and Ruff continued to discuss robbing Roseboro. The parties returned to room 108 at the Governors Inn and made plans to enter room 109; however, before they went to room 109, Roseboro and Byers left the Governors Inn in a vehicle. Defendant, Lankford, Sigmon, and Ruff then left in a vehicle and drove in the direction of Roseboro's house. As they were driving, however, they saw Byers returning to the motel so they decided they would also return to the motel.

Approximately twenty minutes later, after the parties saw Byers return to room 109 by herself, Defendant, Ruff, and Lankford left room 108 and stood outside of room 109. Lankford knocked on the door to room 109 and, after Byers opened the door, Defendant and Ruff "pushed" Lankford into the room and entered the room behind her. Defendant and Ruff both had guns, and they "told [Byers] to l[ie] down [on] the bed with her head in the pillow." Byers complied, and the parties searched the room. After they searched the room, Defendant told Lankford to instruct Byers to remove her clothing. Lankford did so, and Byers removed her clothing. Lankford then left the room and returned to room 108, where she told Sigmon what had occurred. Approximately ten minutes later, Ruff returned to room 108 and told Lankford that Defendant was " 'in room 109 having sex with [Byers].' "

A few minutes later, Lankford and Sigmon left the motel in Sigmon's vehicle. They followed a vehicle driven by Ruff, in which Defendant and Byers were passengers. The parties drove to a dirt road, and Defendant and Byers got out of the vehicle. Defendant then walked over to the vehicle in which Lankford was riding and told Lankford to get out of the vehicle because they "were going to kill [Byers]." Lankford got out of the vehicle and stood beside Defendant, and Defendant shot Byers. Byers, whose hands were tied behind her back, "[f]ell on the ground." Defendant then handed a gun to Lankford and told her that "if [she] didn't shoot [Byers] too that he would shoot [Sigmon and Lankford]." Lankford shot in the direction of Byers, and then, at Defendant's request, Lankford gave the gun to Sigmon. After Lankford gave the gun to Sigmon, Lankford ran in the direction of the vehicles. As she was running she heard a gunshot.

Lankford got into one of the vehicles and, as she looked in the direction of Byers, she saw Byers sit up. Defendant then shot Byers two additional times.

During Lankford's testimony, the State handed Lankford a document that Lankford identified as the written statement she gave to Billy Benton (Benton), a lieutenant with the Cleveland County Sheriff's Department, subsequent to the shooting. The State identified the statement as "Exhibit No. 23" and sought to introduce the statement into evidence. Defendant objected and the trial court overruled the objection. The trial court then instructed the jury that the statement was being "admitted for the limited purpose . . . for you to determine whether it is either consistent with or inconsistent with her testimony here at court, and you may consider it for that purpose only."

During cross-examination, Defendant asked Lankford about several statements in exhibit 23 that were inconsistent with her testimony at trial. Defendant asked Lankford whether she had testified during direct examination that she "shot in the general direction of [Byers]." Lankford responded, "Yes." Defendant then asked Lankford to read a portion of her statement, in which Lankford said that she " 'shot [Byers] in the head.' " Defendant also asked Lankford at what time she returned to the Governors Inn with Ruff and Zeek on 8 February, and she responded, "It was late. I don't know. . . . Maybe 10:00 or 11:00." Defendant then noted that Lankford's statement indicated the parties returned to the Governors Inn at 12:30 a.m. Additionally, Defendant asked Lankford about inconsistencies in her statement regarding actions she testified were taken by Haynes although her statement indicated these actions were taken by Lamar. Lankford testified that the law enforcement officers taking her statement must have confused Lamar with Lamont Haynes. Lankford also testified that Benton was "verbally abusing" her and "putting words in [her] mouth for [her]" while she was giving her statement.

On redirect examination of Lankford, the State used an overhead projector to project exhibit 23 onto a screen. Defendant noted his previous objection to the admission into evidence of exhibit 23 and also requested a limiting instruction. The trial court, therefore, gave the jury a second limiting instruction. The State then read lines from exhibit 23 to Lankford, and asked Lankford whether the information contained in each line was correct. Defendant objected to this method of questioning, in pertinent part, on the ground the evidence was not relevant and the evidence was not admissible under Rule 403

of the North Carolina Rules of Evidence. The trial court overruled Defendant's objection.

The State then continued to question Lankford regarding the statement, and the following information from the statement was read into evidence: the time and place that the statement was given; the times Lankford and Sigmon checked into the Governors Inn and where they went prior to checking into the motel and subsequent to checking into the motel; the location of Ruff's residence, which Lankford testified was incorrect; Sigmon's telephone call to Ruff from the motel; Lamar's statements regarding getting drugs from room 109, which Lankford testified was incorrect because Haynes actually made those statements; Lamar's and Byers' actions when they came to room 108, which Lankford testified was incorrect because Byers was actually with Haynes and not Lamar; a statement made by Lamar that Roseboro had been cooking cocaine in the bathroom in room 109, which Lankford testified was incorrect because Haynes actually made this statement; and Byers' statement to Lamar that it would not be much longer before Lamar could purchase cocaine from Roseboro, which Lankford testified was incorrect because Byers actually made this statement to Haynes.

Defendant again objected to this testimony on the ground it was not corroborative of anything testified to by Lankford during direct examination. The trial court ruled that there was no "substantial disagreement" between the portions of the statement that the State questioned Lankford about and the testimony elicited during Lankford's direct examination. The trial court also ruled that only the corroborative portions of exhibit 23 were admissible, and the trial court redacted the portions of exhibit 23 that it found were not corroborative. Additional portions of exhibit 23 were also redacted at the request of Defendant.

Subsequent to the redaction of exhibit 23, the State resumed questioning of Lankford regarding statements contained in exhibit 23. Lankford testified that her statement to Benton that room 109 probably contained a lot of " 'coke' " and money was correct; her statement that she and Sigmon went to pick up Ruff and Defendant was correct; her statement that she told Ruff that Roseboro " 'would probably have a gun' " was correct; her statement that when the parties returned to the Governors Inn, Byers' vehicle was still parked at the Governors Inn and Roseboro was in the room next to their room was correct; her statement that they heard Roseboro and Byers leave their motel room and Lankford devised a plan to rob them in the

parking lot was correct; her statement that the parties intended to follow Roseboro and Byers and that they saw Byers driving in the direction of the Governors Inn was correct; her statements regarding the details of how the parties carried out their plan to rob Roseboro and Byers were correct; her statements regarding how Byers was killed were correct; and her statement that she saw Byers " 'roll' " after Byers was shot was incorrect, as she actually saw Byers "sit up" rather than "roll."

Sigmon testified that on 9 February 1997, she was staying in a motel at the Governors Inn with Lankford. On that afternoon, Haynes and Lamar were in the motel room with Sigmon and Lankford when Byers came into the room. The State asked Sigmon what, if anything, Byers said when she came into the room. Defendant objected to this question on the ground the response would be hearsay. The trial court overruled the objection and instructed the jury that the testimony was "admitted for the limited purpose of establishing that it was said, and to explain the actions of others and not for the truth of the substance of what she said . . . and may be considered . . . for that purpose only." Sigmon then testified that when Byers entered the room, Haynes asked Byers "about some drugs." Byers responded: "Roseboro . . . has half a kilo of cocaine . . . . [Roseboro] was in the bathroom cooking it; for him to come back in an hour, and if there was any kind of drug over there[] that he would want for him to come back."

Sigmon also testified regarding a plea agreement that she entered into with the State as a result of the events that took place on 9 February 1997. The State handed Sigmon a document marked "State's Exhibit 24," and Sigmon identified this document as the plea agreement. Sigmon testified that her signature appeared on the plea agreement, and that exhibit 24 was a certified copy of the plea agreement. Sigmon also testified that exhibit 24 was "the full and complete plea agreement entered into between [her] and the State." The State then moved to introduce exhibit 24 into evidence and Defendant objected on the ground a proper foundation had not been laid. The trial court overruled the objection and admitted the exhibit into evidence. The State then handed Sigmon a second document identified as "State's Exhibit 25." The State asked Sigmon to identify the document, and she identified it as "the other half of the plea, where . . . they ask me questions." She testified her signature appeared on the document and the document was a certified copy. The State then moved to introduce exhibit 25 into evidence. Defendant objected on the grounds of

"relevance" and "improper foundation." The trial court overruled the objection and admitted exhibit 25 into evidence. Sigmon testified that as part of the plea agreement, she pleaded guilty to second-degree murder, first-degree burglary, first-degree kidnapping, and armed robbery. She also testified that the charge of conspiracy was dismissed as part of the plea agreement, and she agreed as part of the plea agreement to testify at Defendant's trial.

The State called Gary Reynolds (Reynolds), a physician's assistant, to testify at trial regarding physical evidence Reynolds obtained from Defendant while Defendant was incarcerated. Defendant objected to this testimony on the ground the evidence was obtained in reliance on an invalid search warrant. The trial court held a *voir dire*, and Deborah Arrowood (Arrowood) testified that she is employed as a detective with the Cleveland County Sheriff's Department and she was involved in the investigation of Byers' death. Arrowood stated that as part of the investigation, she prepared an application for a search warrant. Arrowood then took the application to Judge Jones, and Arrowood was sworn by Judge Jones in Judge Jones' office. Attached to the application was an affidavit signed by Arrowood. Judge Jones signed the portion of the affidavit labeled "Sworn and Subscribed before me." Arrowood also signed the application; however, Judge Jones did not sign the portion of the application labeled "SWORN AND SUBSCRIBED TO BEFORE ME." After reviewing the application, Judge Jones issued a search warrant and the search warrant was executed. Subsequent to *voir dire*, the trial court found as follows:

> [T]he requirement of 15A-244 regarding the contents of the application for a search warrant are met . . . . The back of the first page, the application for search warrant is signed by . . . Arrowood. She, likewise, signed the attachments to the search warrant that are the second and third pages of the exhibits. I further find that she was sworn by Judge Jones and made this application for [the] search warrant with attachments under oath as required by the statute, that the application and attachments contain the information required by 15A-244.

The trial court, therefore, denied Defendant's motion to suppress physical evidence obtained from Defendant.

Ronald Marrs (Marrs), an expert in firearms and toolmark examination, testified he is employed at the crime laboratory of the North Carolina State Bureau of Investigation (SBI). As part of his employ-

ment duties, Marrs received for examination several shell casings allegedly recovered as a result of the shooting of Byers. Marrs examined each shell casing to determine whether it was "a projectile or cartridge case, . . . the caliber, the manufacturer, whether there were any markings present to indicate it had been fired, extracted, [or] ejected from a firearm." The State asked Marrs whether he had done a comparison of shell casings marked for identification as State's exhibits 36, 37, 38, 39, and 41. Defendant objected to this question on the ground no proper foundation had been laid, and the trial court overruled the objection. Marrs testified he examined these exhibits "using an instrument known as a comparison microscope," and Marrs testified about the method for using a comparison microscope. Based on his comparisons, Marrs was able to determine that "four of [the shell casings] were worked through the action of the same gun." Further, "[t]he fifth [shell casing] had the same characteristics, but did not have enough of the individual characteristics needed for [him] to scientifically say that it had been worked through the same gun as the other four."

James A. Gregory (Gregory), an expert in the field of hair and fiber analysis, testified he is employed by the SBI "as a special agent assigned to the crime laboratory in Raleigh in the trace evidence section." Gregory testified he received approximately twenty-five items for analysis in connection with the investigation of Byers' death. These items included pubic hair samples known to be from particular individuals, including Byers, Defendant, Sigmon, Ruff, and Roseboro, as well as pubic hair samples which were found on Byers and were from unknown individuals. Gregory testified regarding the process that he used to determine whether each hair sample was "suitable for analysis." After determining which samples were suitable, he mounted the suitable samples onto microscope slides and used a "comparison microscope" to compare "known" samples to "unknown" samples. The State asked Gregory about the results of his comparisons, and Defendant objected on the ground a proper foundation had not been laid. The trial court overruled the objection. Gregory then testified that based on his comparisons, he determined that one of the "unknown" samples was "microscopically consistent" with a known sample of Defendant's hair. Gregory also concluded this "unknown" sample was not consistent with the "known" samples of hair from Ruff and Roseboro.

David Spittle (Spittle), an expert in DNA analysis testing, testified he is employed as a Special Agent with the molecular genetics section

of the SBI. Spittle testified regarding the methods of DNA analysis used by the SBI, and he stated he is "familiar with the procedures used by the [SBI] lab in the receiving and processing of items on which DNA testing [is] to be conducted." The State asked Spittle to identify State's exhibit 102, and Spittle identified the exhibit as a file containing laboratory reports and notes regarding Byers' case. Spittle testified the file was "maintained in the regular course of business conducted . . . at the SBI lab" and Spittle had reviewed the contents of the file including the results of tests conducted in connection with the case. The file indicated the DNA tests were performed by Jennifer Elwell (Elwell), a staff member of the SBI, who worked in the molecular genetics section. Spittle worked with Elwell, and Spittle "had reviewed this file at an earlier date specifically doing a technical review of the work of [Elwell]."

Spittle testified he was able to look at exhibit 102 and determine what tests were performed on the DNA samples. He described the DNA samples collected from Byers, which included "a liquid blood sample, two vaginal smears, four vaginal swabs, panties, two rectal smears, four rectal swabs, two oral smears, four oral swabs, two saliva swabs, known pubic hair combings, known pubic hair sample, known head hair sample and control swabs." The test results indicated that the examination of these items "revealed the presence of spermatozoa." The State asked Spittle whether, "as an expert, [he was] able to look at this file and look at the results and give [his] opinion as to the results of these tests." Spittle responded, "Yes." The State then asked Spittle what the results of the tests were, and Defendant objected pursuant to Rules 402, 403, 702, and 703 of the North Carolina Rules of Evidence, under the Sixth Amendment right to confront the witnesses against him, and on the ground no proper foundation had been laid. The trial court overruled the objection, and Spittle testified the DNA profile obtained from the oral swabs of Byers matched the DNA profile of the known blood sample taken from Defendant. Defendant objected on the ground Spittle was "simply reading a report as opposed to giving his opinion." The trial court then asked Spittle, "[I]s that your opinion as to the results of the testing." Spittle replied, "Yes," and the trial court overruled the objection. Subsequent to the ruling, Spittle gave the following testimony regarding the "statistical weight" of the DNA match:

> The probability of finding another unrelated individual having the same DNA profile which was obtained from the oral swabs is approximately one in 3,170 individuals from the North Carolina

white population, one in 1,220 individuals comprising the North Carolina black population, and one in 2,820 individuals in the North Carolina Lumbee Indian population.

Lucy Milks (Milks) testified she is employed in the molecular genetic section of the DNA unit of the SBI crime investigation laboratory. The State tendered Milks as an expert in DNA analysis, and the trial court instructed the jury that "Milk[s] will be allowed to testify as an expert in the field of DNA analysis if [the jury] find[s] her to be so qualified." Milks testified she received several DNA samples relating to this case, including dried blood stain samples from Byers, Defendant, Ruff, and Roseboro, a sample from Byers' "panties," and vaginal swabs of Byers. Milks conducted DNA tests on these samples and she went "through a series of steps to actually remove the DNA from the cells, cut them, [and] separate them into fragments of different sizes." After the DNA was removed from the cells, Milks "end[ed] up with a piece of film which has a DNA banding profile on it [and] [t]he band is like a bar code that you see on items." The State asked Milks whether, in this case, she was able to make conclusions based on the banding profiles. Defendant objected to this question on the ground no proper foundation had been laid, and the trial court overruled the objection. Milks then testified that she made the following conclusions based on the banding profiles: "the DNA banding pattern obtained from the male fraction from the cutting of the panties matched the DNA banding pattern obtained from the known blood stain from [Defendant] and did not match the banding pattern obtained from . . . Ruff or . . . Roseboro"; and, "the DNA banding pattern[] obtained from the male fraction of the vaginal swabs matched the DNA pattern of [Defendant] and does not match the banding pattern obtained from . . . Ruff or . . . Roseboro." The State then asked Milks: "What statistical weight can you give to the matches you obtained from your tests?" Defendant objected "as to the form of the question," and the trial court overruled the objection. Milks then testified regarding the statistical weight of the results she obtained.

The State called Benton to testify regarding Defendant's attempted flight from Benton on 12 February 1997. Prior to Benton's testimony, Defendant objected to any testimony regarding Defendant's flight on the ground "it is unfairly prejudicial and the probative value of this evidence regarding flight does not outweigh the unfairness as provided by Rule 403." Defendant also argued the evidence should be excluded under Rule 404 of the North Carolina Rules of Evidence as evidence of "other criminal conduct." The trial court

overruled Defendant's objection, finding "the evidence is relevant to prove flight and that its probative value is not substantially outweighed by the danger of unfair prejudice to . . . [D]efendant."

Subsequent to the trial court's ruling, Benton testified that on 12 February 1997, at approximately 11:30 a.m., he and two other law enforcement officers traveled to McIntire's Trailer Park to follow up on a lead in the investigation of Byers' death. The officers were traveling in an unmarked patrol car and were dressed in their law enforcement uniforms. After arriving at the trailer park, Benton saw a man fitting the description of Defendant walking across a street with three other individuals. Benton and another officer got out of Benton's vehicle and approached the four individuals. Benton "asked each individual for identification and [told them] that [they] were looking for a black male by the name of Shawn." Defendant told Benton he did not have any identification on him, and Benton approached Defendant to determine whether he was concealing any weapons under his coat. When Benton "got within arm's reach of [Defendant]," Defendant "started running." As Defendant was running, "he pulled a handgun from either the coat pocket or the waistband of his pants and fired several shots at [Benton] and [the other officer]." Benton returned fire at Defendant, and Defendant was struck by a bullet fired by Benton. Defendant was subsequently taken into custody.

Defendant did not present any evidence at trial. Subsequent to its deliberations, the jury returned verdicts finding Defendant guilty of first-degree murder, first-degree rape, first-degree kidnapping, robbery with a firearm, and first-degree burglary.

---

The issues are whether: (I) the trial court's finding that Defendant did not meet his burden of proving intentional discrimination in the State's use of its peremptory challenges to excuse Pressley and Clemmons from the jury is clearly erroneous, and whether the trial court's finding that Defendant did not meet his burden of establishing a *prima facie* case of intentional discrimination in the State's use of its peremptory challenges to excuse White and Hartgrove from the jury is clearly erroneous; (II) the application for a search warrant submitted to Judge Jones by Arrowood met the requirements of N.C. Gen. Stat. § 15A-244; (III) Lankford's testimony regarding statements made by Byers was inadmissible hearsay and, if not, whether the probative value of this evidence was "substantially outweighed by the danger of unfair prejudice" under Rule 403 of the North Carolina

Rules of Evidence; (IV) Lankford's statement to Benton corroborated Lankford's testimony at trial, and whether the trial court abused its discretion by allowing the State to question Lankford regarding individual lines in the statement; (V) evidence that Sigmon entered into a plea agreement with the State, in which she agreed to testify against Defendant, was relevant under Rule 401 of the North Carolina Rules of Evidence; (VI) Gregory's testimony regarding hair comparisons and Marrs' testimony regarding shell casings were based on reliable scientific methodology; (VII) the report relied upon by Spittle was inherently reliable, and whether the trial court expressed its opinion regarding the validity of the report in violation of N.C. Gen. Stat. § 15A-1222; (VIII) Milks was properly permitted to testify as an expert pursuant to Rule 702 of the North Carolina Rules of Evidence; and (IX) evidence of Defendant's flight from Benton was inadmissible under Rule 404(b) of the North Carolina Rules of Evidence.

I

*Pressley and Clemmons*

[1] Defendant objected at trial to the State's exercise of peremptory challenges to excuse Pressley and Clemmons on the ground the State's actions were intentionally discriminatory and, therefore, in violation of *Batson*.

"In *Batson*, the United States Supreme Court created a three-pronged test to determine whether a prosecutor impermissibly excused prospective jurors on the basis of their race." *State v. Bond*, 345 N.C. 1, 20, 478 S.E.2d 163, 172 (1996), *cert. denied*, 521 U.S. 1124, 138 L. Ed. 2d 1022 (1997).

First, a criminal defendant must establish a *prima facie* case of intentional discrimination by the prosecutor. Finding a *prima facie* case shifts the burden to the State, which must give race-neutral explanations for peremptorily challenging a juror of a cognizable group. The reason does not have to be plausible. What is at issue in the second step is the " 'facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race[-]neutral.' " Once the State gives an explanation for its peremptory challenges, the trial court then determines "whether the defendant has carried his burden of proving purposeful discrimination."

*Id.* at 20-21, 478 S.E.2d at 172-73 (citations omitted). Whether the State intended to discriminate against the members of a race in its selection of the jury is a question of fact, *id.* at 22, 478 S.E.2d at 173, and the trial court's findings will be upheld on appeal "unless the appellate court is convinced that the trial court's decision is clearly erroneous," *State v. Crockett*, 138 N.C. App. 109, 115, 530 S.E.2d 359, 363, *disc. review denied*, 352 N.C. 593, —— S.E.2d —— (2000).

In this case, Defendant objected to the State's use of its peremptory challenges to excuse Pressley and Clemmons. Defendant argued during *voir dire* that "[t]here is no legitimate reason for dismissal by the State of the two blacks on the jury except to try to get all white jurors to sit and hear this matter." Prior to ruling on whether Defendant had established a *prima facie* case under *Batson*, the trial court allowed the State to present race-neutral reasons for excusing Pressley and Clemmons. Whether Defendant met his burden of establishing a *prima facie* case is, therefore, moot. *See State v. Hoffman*, 348 N.C. 548, 551-52, 500 S.E.2d 718, 721 (1998). Accordingly, we must determine whether the trial court's findings that "the stated reasons by the [State] were . . . legitimate grounds to exercise peremptory challenge not related to race" and that Defendant did not carry his burden of proving purposeful discrimination are clearly erroneous.[1]

The State offered as reasons for excusing Pressley that he did not own his own home, he had not lived at his residence for more than five years, and he knew a co-defendant. As these reasons are race-neutral on their face, the trial court properly determined these reasons were "not related to race." *See Bond*, 345 N.C. at 20, 478 S.E.2d at 172-73. Further, the record contains no evidence the State made any racially motivated statements or asked any racially motivated questions during *voir dire*, and the record shows one black juror served on the panel. *See State v. Sanders*, 95 N.C. App. 494, 502, 383 S.E.2d 409, 414 (1989). Moreover, Defendant did not offer any evidence tending to show racial discrimination by the State in the use of its peremptory challenges. *See id.* The trial court's denial of Defendant's *Batson* motion regarding Pressley was, therefore, not clearly erroneous.

---

1. Although the trial court did not specifically state in its findings that Defendant failed to carry his burden of proving intentional discrimination, this finding is implicit in the trial court's denial of Defendant's *Batson* motion. *See Bond*, 345 N.C. at 21, 478 S.E.2d at 173.

The State offered as reasons for excusing Clemmons that she knew the co-defendant and she had previously been charged with aiding and abetting a murder. These reasons are racially neutral on their face. Further, as with Pressley, Defendant did not offer any evidence tending to show racial discrimination by the State in the use of its peremptory challenges, and the record does not contain any evidence suggesting Clemmons was dismissed from the jury for racially discriminatory reasons. The trial court's denial of Defendant's *Batson* motion regarding Clemmons was, therefore, not clearly erroneous.

### White and Hartgrove

[2] Defendant also objected at trial to the State's use of its peremptory challenges to excuse White and Hartgrove from the jury on the ground the State's actions resulted in intentional discrimination, in violation of *Batson*. Because the trial court found Defendant had not made "any . . . prima facie showing of any pattern of racial discrimination" regarding White and Hartgrove, this Court's review is limited to whether this finding is clearly erroneous. *See Hoffman*, 348 N.C. at 552, 500 S.E.2d at 721.

A *prima facie* showing must raise an inference of intentional discrimination. *State v. Quick*, 341 N.C. 141, 144, 462 S.E.2d 186, 188 (1995). Factors to consider when making this determination include:

> the defendant's race, the victim's race, the race of the key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, repeated use of peremptory challenges against blacks such that it tends to establish a pattern of strikes against blacks in the venire, the prosecution's use of a disproportionate number of peremptory challenges to strike black jurors in a single case, and the State's acceptance rate of potential black jurors.

*Id.* at 145, 462 S.E.2d at 189.

In this case, the record shows Byers, the victim, was white and Defendant is black. Additionally, the State used its peremptory strikes to excuse four of the six black jurors in the jury pool, and the composition of the jury panel was eleven white jurors and one black juror. These factors are sufficient to raise a *prima facie* inference of intentional discrimination by the State in its use of its peremptory strikes. *See Hoffman*, 348 N.C. at 553-54, 500 S.E.2d at 722 (*prima facie* case of intentional discrimination established when record

shows defendant was black, victim was white, and State used peremptory challenges to strike three black jurors). The trial court's finding that Defendant did not make a *prima facie* showing of intentional discrimination is, therefore, clearly erroneous. This error, however, does not require a new trial. *State v. Hall*, 104 N.C. App. 375, 384, 410 S.E.2d 76, 81 (1991). Rather, because we find no other error in Defendant's trial, this case is remanded to the Cleveland County Superior Court. *See id.* On remand, a judge presiding over a criminal session shall hold a hearing and provide the State with an opportunity to give a race-neutral reason for striking White and Hartgrove. If the trial court finds the State's explanation is not race-neutral, Defendant is entitled to a new trial. If the trial court finds the State's explanation is race-neutral, Defendant shall be given the opportunity to demonstrate that the explanation was a mere pretext. If Defendant meets his ultimate burden of proving intentional discrimination, he is entitled to a new trial. If he does not meet this burden, the trial court will order commitment to issue in accordance with the judgment appealed from and dated 7 April 1999.

II

[3] Defendant argues the application for a search warrant submitted to Judge Jones by Arrowood was not sworn, and Defendant's motion to suppress evidence obtained as a result of the search warrant, therefore, should have been suppressed.[2] We disagree.

N.C. Gen. Stat. § 15A-244 provides that "[e]ach application for a search warrant must be made in writing upon oath or affirmation." N.C.G.S. § 15A-244 (1999). A judicial official, therefore, may base a finding of probable cause to issue a warrant "only on statements of fact confirmed by oath or affirmation of the party making the statement, or on information which the magistrate records or contemporaneously summarizes in the record." *State v. Heath*, 73 N.C. App. 391, 393, 326 S.E.2d 640, 642 (1985).

In this case, Arrowood submitted an application for a search warrant to Judge Jones, and Arrowood attached a sworn affidavit to her application. The application itself did not state on its face that it was

---

2. Defendant also argues in his brief to this Court that the search warrant should have been suppressed because it did not contain "the time of issuance" and was not directed to "a specific officer or . . . classification of officers." Because Defendant did not make these arguments before the trial court, these arguments are not properly before this Court. N.C.R. App. P. 10(b)(1). We, therefore, do not address these arguments.

sworn. The trial court found, however, that Arrowood "was sworn by Judge Jones and made this application for [the] search warrant with attachments under oath as required by the statute." This finding of fact is supported by Arrowood's testimony during *voir dire* that she signed the application in Judge Jones' presence after being sworn by Judge Jones. We are, therefore, bound by this finding of fact. *See id.* Accordingly, the trial court properly denied Defendant's motion to suppress evidence obtained as a result of the search warrant.

### III

[4] Defendant argues Lankford's testimony regarding statements made by Byers was inadmissible hearsay or, in the alternative, was inadmissible under Rule 403 of the North Carolina Rules of Evidence. We disagree.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (1999).

In this case, Lankford testified that Byers told Haynes, in Lankford's presence, that "Roseboro was in [room] 109, and he had [drugs] and a lot of money." Lankford then told Sigmon to tell Ruff that there were drugs and money in room 109. The State did not offer testimony of Byers' statement for the truth of the statement; rather, the testimony was offered "to show what Lankford did" based on Byers' statement. Because evidence of Byers' statement was offered for this limited purpose, the trial court gave the jury a limiting instruction regarding this evidence.[3] Accordingly, this evidence was properly admitted at trial.[4]

---

3. Defendant argues in his brief to this Court that the language of the limiting instruction given to the jury was erroneous. Defendant contends the trial court's instruction that the evidence was "offered as—to the fact that the statement was made and the content of the statement itself" would lead the jury to believe it could consider Lankford's testimony for the truth of the matter asserted. While this language, standing alone, might cause confusion to a jury, the trial court's instruction, taken in its entirety, clearly instructed the jury that "[Lankford's] testimony about statements by . . . Byers, are not offered for the truth of the content of . . . Byers' statements." The limiting instruction given to the jury, therefore, was not erroneous.

4. In addition to testimony given by Lankford, Defendant assigns error to Sigmon's testimony that when Byers came into room 108 Byers said that Roseboro had drugs in room 109. As with Lankford's testimony regarding the statement made by Byers, Sigmon's testimony was not offered for the truth of the matter asserted and a limiting instruction was also given to the jury at the time the evidence was offered. Accordingly, the trial court did not err by admitting this evidence.

STATE v. McCORD

[140 N.C. App. 634 (2000)]

In the alternative, Defendant argues this evidence should have been excluded under Rule 403 of the North Carolina Rules of Evidence because "the probative value [of the evidence] was substantially outweighed by the danger of unfair prejudice."[5] Defendant does not argue in his brief to this Court how the probative value of Lankford's testimony regarding Byers' statements would be substantially outweighed by the danger of unfair prejudice, and the record reveals no danger of unfair prejudice under Rule 403. Accordingly, the trial court's finding that the "probative value [of this evidence] is not outweighed by any undue prejudice to . . . [D]efendant," which may be reversed on appeal only for an abuse of discretion, was not error. *See State v. Mason*, 315 N.C. 724, 731, 340 S.E.2d 430, 435 (1986) (whether to exclude evidence under Rule 403 is within sound discretion of trial court).

IV

[5] Defendant argues the trial court erred by admitting into evidence Lankford's prior statement to Benton because the statement did not corroborate Lankford's testimony at trial. We disagree.

A witness's prior consistent statements are admissible as corroborative evidence. *State v. Ramey*, 318 N.C. 457, 468, 349 S.E.2d 566, 573 (1986). In order to be admissible as corroborative, "the prior statement of the witness need not merely relate to specific facts brought out in the witness's testimony at trial, so long as the prior statement in fact tends to add weight or credibility to such testimony." *Id.* at 469, 349 S.E.2d at 573. A witness's contradictory statements, however, "may not be admitted under the guise of corroborating his testimony." *Id.* at 469, 349 S.E.2d at 574.

In this case, Defendant elicited during cross-examination of Lankford several alleged inconsistencies between her testimony at trial and her statement to Benton. These include that Lankford testified at trial that she "shot in the general direction of [Byers]" and Lankford told Benton that she " 'shot [Byers] in the head' "; Lankford testified at trial that it was "late" when she returned to the motel and that it may have been "10:00 or 11:00," and Lankford told Benton that she returned to the motel at 12:30 a.m.; Lankford testified at trial that

---

5. Defendant also argues in his brief to this Court that this evidence was inadmissable under Rule 403 because the probative value of the evidence "was substantially outweighed by the danger of . . . confusion of the issue and would mislead the jury." Defendant, however, did not raise these arguments before the trial court and we, therefore, do not address them. N.C.R. App. P 10(b)(1).

certain actions were taken by Lamont Haynes and that the officers taking her statement had confused Lamar with Lamont Haynes; and Lankford testified at trial that after Byers was shot, Byers " 'roll[ed],' " and Lankford told Benton that after Byers was shot, she "s[a]t up." The variations in Lankford's testimony at trial do not directly contradict her statement given to Benton; rather, the information in the statement was "substantially similar to and tended to strengthen and confirm" Lankford's testimony at trial regarding the events leading up to the shooting of Byers. *See State v. Gell,* 351 N.C. 192, 204, 524 S.E.2d 332, 341 (prior statement admissible to corroborate trial testimony when prior statement "contained slight variations and some additional information"), *cert. denied,* —— U.S. ——, 148 L. Ed. 2d 110 (2000); *State v. Frogge,* 345 N.C. 614, 618, 481 S.E.2d 278, 280 (1997) (prior statement not admissible to corroborate trial testimony when "prior statement contained information manifestly contradictory to [witness's] testimony at trial and did not corroborate the testimony"). Accordingly, the trial court properly allowed Lankford's statement into evidence as corroborative evidence.[6]

[6] Defendant also argues the method used by the State during redirect examination of Lankford was error. We disagree.

In this case, Lankford testified during cross-examination that when she gave her statement to Benton, Benton was "verbally abusing" her and "putting words in [her] mouth for [her]." The State, therefore, asked Lankford on redirect examination about whether many of the lines in the statement were "correct." The method used by the State was to read a line from the statement and then ask Lankford whether the line was correct. The method of questioning allowed at trial was within the discretion of the trial court, *State v. Harris,* 308 N.C. 159, 168, 301 S.E.2d 91, 97 (1983) ("manner of the presentation of evidence is largely in the discretion of the trial judge [and] [h]is control of the case will not be disturbed absent a manifest abuse of discretion"), and the trial court did not abuse its discretion by allowing the State to read portions of Lankford's statement,[7]

6. Defendant argues in his brief to this Court that by redacting portions of Lankford's statement, the trial court "assisted the State in obtaining the State's intended result, all in violation of the Rules of Evidence and the Trial Court's proper function." Defendant, however, cites no authority and makes no argument as to what rule of evidence was violated or how the trial court's actions were outside of its proper function. We, therefore, do not address this issue. *See* N.C.R. App. P. 28(b)(5).

7. As with the State's initial questions to Lankford regarding her statement, Defendant argues the portions of the statement brought out on redirect examination did not corroborate Lankford's testimony at trial. These statements, however, were

*see State v. Burrus*, 344 N.C. 79, 90, 472 S.E.2d 867, 875 (1996) ("trial court may be reversed for an abuse of discretion only upon a showing that its ruling could not have been the result of a reasoned decision").

V

**[7]** Defendant argues the plea agreement entered into by Sigmon, as well as the plea transcript, were not relevant and, therefore, inadmissible.[8] We disagree.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1999).

In this case, Sigmon testified for the State regarding Defendant's involvement in the death of Byers. The fact that Sigmon entered into a plea agreement with the State, in which she agreed to testify against Defendant, was relevant to Sigmon's credibility. Accordingly, the trial court properly admitted the plea agreement and plea transcript into evidence. *See Sherrod v. Nash General Hospital, Inc.*, 126 N.C. App. 755, 762, 487 S.E.2d 151, 155 (1997) (trial court's ruling regarding admissibility of evidence under Rule 401, although not discretionary, is given great deference on appeal), *aff'd in part and reversed in part on other grounds*, 348 N.C. 526, 500 S.E.2d 708 (1998).

VI

**[8]** Defendant argues Gregory's testimony regarding hair comparisons and Marrs' testimony regarding shell casings were inadmissible because no proper foundation was laid to show "the reliability of the scientific methods" used by these witnesses. We disagree.

"[An] expert's scientific technique on which he bases his opinion must be such that its 'accuracy and reliability has become estab-

---

"substantially similar to and tended to strengthen and confirm" Lankford's testimony at trial. The statements were, therefore, admissible as corroborative evidence. *See Gell*, 351 N.C. at 204, 524 S.E.2d at 341.

8. In the alternative, Defendant argues that even if the plea agreement and plea transcript were relevant, the probative value of this evidence was "outweighed by the danger of unfair prejudice, confusion of the issue, and misleading the jury." Defendant did not raise this argument at trial and we, therefore, do not address it. N.C.R. App. P. 10(b)(1).

lished and recognized.' " *State v. Huang,* 99 N.C. App. 658, 663, 394 S.E.2d 279, 282 (quoting *State v. Temple,* 302 N.C. 1, 12, 273 S.E.2d 273, 280 (1981)), *disc. review denied,* 327 N.C. 639, 399 S.E.2d 127 (1990). The emphasis of this consideration is "on the reliability of the scientific method and not its popularity within a scientific community." *State v. Bullard,* 312 N.C. 129, 149, 322 S.E.2d 370, 381-82 (1984).

In this case, Gregory testified about his use of a "comparison microscope" to compare "known" and "unknown" hair samples. Gregory concluded based on these comparisons that a pubic hair sample taken from Byers was "microscopically consistent" with a "known" sample of Defendant's pubic hair. Although the trial court did not specifically find that the comparison of hair samples is reliable scientific methodology, this finding was implicit in the trial court's overruling of Defendant's objection to Gregory's testimony. *See State v. Wise,* 326 N.C. 421, 430, 390 S.E.2d 142, 148 ("trial court's overruling of defense counsel's objection to the opinion testimony constituted an implicit finding that the witness was an expert"), *cert. denied,* 498 U.S. 853, 112 L. Ed. 2d 113 (1990). Additionally, because the comparison of hair samples has been accepted as reliable scientific methodology in this State, the trial court properly allowed Gregory to testify regarding the results of his testing. *See, e.g., State v. Green,* 305 N.C. 463, 469-70, 290 S.E.2d 625, 629 (1982).

The State also presented expert testimony regarding shell casings allegedly recovered as a result of the shooting of Byers. Marrs testified that he examined these shell casings "using an instrument known as a comparison microscope." Based on his comparisons, Marrs concluded that "four of [the shell casings] were worked through the action of the same gun" and "[t]he fifth [shell casing] had the same characteristics, but did not have enough of the individual characteristics needed for [Marrs] to scientifically say that it had been worked through the same gun as the other four." Although the trial court did not specifically find that the comparison of shell casings is reliable scientific methodology, this finding was implicit in the trial court's overruling of Defendant's objection to Marrs' testimony. *See Wise,* 326 N.C. at 430, 390 S.E.2d at 148. Additionally, because the comparison of bullets and weapons has been accepted as reliable scientific methodology in this State, the trial court properly allowed Marrs to testify regarding the results of his testing. *See, e.g., State v. Alston,* 294 N.C. 577, 585, 243 S.E.2d 354, 360 (1978).

## VII

**[9]** Defendant argues the trial court erred by allowing Spittle to testify regarding a report that he did not prepare because Spittle's testimony regarding the report was hearsay.[9] We disagree.

"Inherently reliable information is admissible to show the basis for an expert's opinion, even if the information would otherwise be inadmissible hearsay." *State v. Daughtry*, 340 N.C. 488, 511, 459 S.E.2d 747, 758 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996).

In this case, Spittle testified regarding the procedure used by the SBI to conduct DNA tests, and he stated the tests in this case were performed by Elwell. Spittle worked with Elwell at the SBI and he reviewed the file in this case "specifically doing a technical review of the work of [Elwell]" on the file. The information contained in the file was, therefore, inherently reliable. *See id.* at 511, 459 S.E.2d at 758-59 (DNA testing relied upon by expert inherently reliable when testing was performed by intern in DNA unit of SBI lab under supervision of expert). Accordingly, the trial court properly permitted Spittle to testify regarding the contents of the report and his opinion of the test results based on the report.[10]

**[10]** Defendant also argues the trial court "expressed [its] opinion as to the validity of the report" when it asked Spittle whether his testimony was "[his] opinion as to the results of the testing."

"The judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1999). In this case, however, the trial court's statement did not express any opinion on whether the report was valid or credible; rather, the trial court merely asked whether Spittle was stating an opinion based on the report. The trial court's question, therefore, did not violate N.C. Gen. Stat. § 15A-1222.

---

9. Defendant also states in his brief to this Court that "the probative value of such statistical data does not outweigh the unfair prejudice to . . . [D]efendant." Defendant, however, makes no argument and cites no authority in support of this contention. We, therefore, do not address it. *See* N.C.R. App. P. 28(b)(5).

10. Defendant states in his brief to this Court that his argument regarding "techniques" used by experts is "incorporated by reference" into the sections of his brief dealing with the testimony of Spittle and Milks. We, therefore, note that the North Carolina Supreme Court has held that "DNA evidence is admissible in North Carolina." *Daughtry*, 340 N.C. at 512, 459 S.E.2d at 759. Accordingly, Spittle and Milks were properly allowed to testify about the results of the DNA testing.

STATE v. McCORD

[140 N.C. App. 634 (2000)]

## VIII

**[11]** Defendant argues the trial court erred by instructing the jury that "Milk[s] will be allowed to testify as an expert in the field of DNA analysis if [the jury] find[s] her to be so qualified" because the expertise of Milks should have been determined by the trial court.

In this case, the record shows Milks was qualified as an expert in the field of DNA analysis and the trial court permitted Milks to give expert testimony in this field. Accordingly, assuming the trial court's statement to the jury was error, this error was harmless. *See Wise,* 326 N.C. at 432, 390 S.E.2d at 149 (trial court's failure to formally qualify witness as an expert was harmless "in light of the evidence of her qualifications, the court's obvious conviction that the witness was an expert, and the fact that the witness'[s] opinion testimony fit within the definition of expert testimony").

## IX

**[12]** Defendant argues evidence regarding his flight from Benton was evidence of "other crimes" and was, therefore, inadmissible under Rule 404(b) of the North Carolina Rules of Evidence. We disagree.

"Evidence of a defendant's flight following the commission of a crime may properly be considered by a jury as evidence of guilt or consciousness of guilt." *State v. King,* 343 N.C. 29, 38, 468 S.E.2d 232, 238 (1996). Evidence of flight is admissible "[e]ven though the evidence of flight may disclose the commission of a separate crime by defendant." *State v. Jones,* 292 N.C. 513, 526, 234 S.E.2d 555, 562 (1977).

In this case, Benton testified that Defendant fled when approached by law enforcement officers. Benton testified regarding the details of the flight, including that Defendant fired a weapon at officers and that Defendant was hit with a bullet fired by Benton. This evidence of flight was admissible to show Defendant's consciousness of guilt. Further, the trial court's determination that the probative value of the evidence "is not substantially outweighed by the danger of unfair prejudice to . . . [D]efendant" was not an abuse of discretion. *See Mason,* 315 N.C. at 731, 340 S.E.2d at 435 (trial court's ruling on admissibility of evidence under Rule 403 may be reversed on appeal only for an abuse of discretion).

Remanded for *Batson* hearing; otherwise, no error.

Judges MARTIN and EDMUNDS concur.