STATE OF NORTH CAROLINA v. HOWARD EUGENE SAFRIT

No. COA00-375

(Filed 21 August 2001)

**1. Evidence— excited utterance—25 minutes after assault— clear motive for fabrication**

The trial court did not err in an assault prosecution in which defendant argued self-defense by excluding statements defendant made to his sister 25 minutes after the altercation where defendant contended that the statements fell within the excited

utterance exception to the hearsay rule, but the circumstances, coupled with defendant's clear motive for fabrication, indicate a lapse of time sufficient to allow manufacture of a statement and show that defendant's statements to his sister lacked sufficient spontaneity.

## 2. Evidence— recorded exculpatory statement–testimony about subsequent statement–door not opened

The State did not "open the door" to the admission of defendant's recorded exculpatory statement to a deputy in a prosecution for felonious assault and armed robbery when it elicited testimony from the deputy that he and defendant had a conversation at the conclusion of defendant's recorded interview during which defendant mentioned having a head injury and asked the deputy to look at it because defendant's remarks to the deputy about his head injury constituted a separate verbal transaction from defendant's prior recorded statement, and the State did not attempt to offer into evidence any portion of defendant's recorded statement or any testimony concerning its contents.

## 3. Sentencing–violent habitual felon— prior violent habitual felon prosecution—same felonies—collateral estoppel

The trial court erred by denying defendant's motion to dismiss a violent habitual felon indictment where another jury in a previous prosecution had found defendant not guilty of being a violent habitual felon based on the same two alleged prior violent felony convictions. The issue to be determined in this case was raised and litigated in the prior action, it was material and relevant to the disposition of the prior action, it was necessary and essential to the jury's not guilty verdict in that action, and the State was collaterally estopped.

Appeal by defendant from judgment and commitment entered 7 October 1999 by Judge William H. Helms in Union County Superior Court. Heard in the Court of Appeals 27 March 2001.

*Attorney General Michael F. Easley, by Assistant Attorney General Elizabeth J. Weese, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Constance E. Widenhouse, for defendant-appellant.*

CAMPBELL, Judge.

On 12 January 1998, Howard Eugene Safrit ("defendant") was indicted on one count of assault with a deadly weapon with intent to kill inflicting serious injury ("97 CRS 15635"), and one count of robbery with a dangerous weapon ("97 CRS 15636"), arising from an altercation with Tyrone Miller that occurred in the early morning hours of 15 November 1997. On 18 May 1998, defendant was charged in a separate indictment ("98 CRS 6730") with being a violent habitual felon, based on alleged prior convictions of armed robbery in 1973, and assault with a deadly weapon inflicting serious injury in 1977. On 7 October 1999, defendant was found guilty of assault with a deadly weapon inflicting serious injury, a lesser included offense of the principal charge in 97 CRS 15635. Defendant was found not guilty of robbery with a dangerous weapon. After the jury's verdict in 97 CRS 15635 was returned, argument was heard on defendant's motion to dismiss the violent habitual felon indictment in 98 CRS 6730 on the grounds that the State was precluded from relitigating the allegations contained in the indictment because defendant had earlier been found not guilty of being a violent habitual felon based on the same two alleged prior violent felony convictions. This motion was denied by the trial court, and defendant was subsequently convicted of being a violent habitual felon. Pursuant to N.C. Gen. Stat. § 14-7.12, defendant was sentenced to life imprisonment without parole. Defendant appeals both the underlying felony assault conviction in 97 CRS 15635, and his conviction of being a violent habitual felon. We find no error in defendant's conviction in 97 CRS 15635. However, we do find that the trial court erred in denying defendant's motion to dismiss the violent habitual felon indictment in 98 CRS 6730, and, therefore, we reverse defendant's conviction of violent habitual felon status and remand for a new sentencing hearing in 97 CRS 15635.

The State's evidence at trial tended to show that on the evening of 14 November 1997, defendant and his wife, Lisa Safrit ("Lisa"), visited the home of Tyrone and Susan Miller ("Susan") and asked Tyrone Miller ("Miller") if he would purchase some cocaine for them. During the previous month, Miller had purchased cocaine for defendant on three or four separate occasions. Miller agreed to buy defendant some cocaine, and when Miller returned with the cocaine, defendant and Lisa took it and left the Miller house. An hour or two later, defendant and Lisa returned to the Miller residence seeking more cocaine. Miller invited the couple in and again went to purchase

cocaine for them. After Miller returned this second time, he and defendant began smoking cocaine and playing cards. Later in the evening, defendant and Lisa again went home to get more money. Defendant later returned to the Miller residence with Rick, one of defendant's friends. Defendant and Miller resumed playing cards and continued playing into the early morning hours of 15 November 1997.

At some point in the evening, the two men began playing cards for money and cocaine. Miller eventually won all of defendant's money, as well as all of his cocaine. When Miller decided he was ready for bed, defendant and Rick got up to leave. Rick started out the door, followed by defendant and Miller. Miller's wife, Susan, was standing near the door. As defendant was walking out the door, Miller turned to see if his money was still on the table, at which time Miller felt a stab in the lower right back. Miller turned back around, saw a knife in defendant's right hand, and began fighting with defendant. Defendant attempted to stab Susan, causing Susan to run into the back room. She was pursued by Rick. Miller heard Susan scream from the back room, got up to assist her, and then was stabbed in the lower left back by defendant. Miller then ran to the back room towards Rick, allowing Susan to break a window and escape from the house.

Miller returned to the front room where he found defendant holding a knife to the throat of Mike, one of Miller's friends, who had apparently passed out in a chair. Miller snatched Mike out of the way and was stabbed in the right shoulder. As the altercation with defendant continued, Miller was again stabbed in the lower right back. Mike left the house to retrieve his shotgun, but by the time he returned, defendant and Rick were driving away in a van.

On cross examination, Miller testified that approximately three weeks prior to this altercation, defendant's wife had given Miller's wife, Susan, rings to be pawned in order to acquire money for cocaine. About a week before the altercation, defendant came to Miller's house demanding the money and the rings.

Susan Miller testified that as defendant was leaving the Miller residence on 15 November 1997 he demanded his money and his wife Lisa's rings, and as Miller turned to see if the money was still on the table, defendant pulled a knife from his coat pocket and stabbed Miller. Defendant then attempted to stab Susan, and the altercation intensified. After having escaped from the house, Susan returned,

picked up a kerosene heater, and threw it at defendant, causing the carpet to catch fire. Susan then picked up the heater, threw it out the door, and ran next door for help.

On cross examination, Susan admitted that she did not actually see Miller get stabbed the first time, but she did see Miller get stabbed in the arm while attempting to protect Mike and in the lower back when Miller and defendant were fighting in the kitchen. Susan also testified that she had taken Lisa Safrit to see C.J. McClure ("McClure"), to whom Lisa pawned rings and earrings in exchange for cash. About two weeks prior to the altercation, Susan accompanied defendant, Lisa and defendant's sister, to McClure's house in an attempt to reclaim Lisa's jewelry. McClure refused to return the jewelry, saying he needed more money. Susan testified that to her knowledge defendant and Lisa had not come up with enough money to get the jewelry back.

Defendant presented evidence that tended to show that in the early morning hours of 15 November 1997, his sister, Debbie Brooks ("Debbie"), was waiting with Lisa for defendant to return home from the Miller residence. Debbie testified that she was worried because defendant had gone to the Miller residence to get back the rings that Lisa had pawned, or money, and he should have been home sooner. According to Debbie's testimony, defendant arrived home shortly after 4:10 a.m., extremely upset and in a state of panic. Defendant had two cuts on his side, and was bleeding from the back of his head.

Nancy Arne also testified that she saw defendant in the early morning hours of 15 November 1997, and he had a big red place on the back of his neck, and a "pretty good size place" on his side that had been bleeding.

After defendant was found guilty of assault with a deadly weapon inflicting serious injury, the State presented evidence on the violent habitual felon charge. This evidence included certified copies of judgments in two prior cases, one from Rowan County and one from Caswell County. The State also introduced into evidence SBI fingerprint cards showing defendant's name and other information. After considering this evidence, the jury returned a verdict of guilty of being a violent habitual felon.

Defendant brings forward in his brief the following four assignments of error: (I) the trial court erred in excluding evidence of defendant's statements to his sister following the altercation, because

the statements were relevant and fall within the excited utterance exception to the hearsay rule; (II) the trial court erred in excluding evidence of defendant's exculpatory statement to Deputy Rollins because the State opened the door to its admission by asking Deputy Rollins about a conversation he had with defendant; (III) the trial court erred in denying defendant's motion to dismiss the violent habitual felon indictment; and (IV) the trial court erred in admitting into evidence fingerprint cards offered to prove defendant's identity as the perpetrator of prior violent felonies for purposes of proving the violent habitual felon charge. Defendant's remaining assignments of error are not set out nor argued in appellant's brief and are, thus, deemed abandoned. *See* N.C. R. App. P. 28(b)(5) (2000).

I.

**[1]** Defendant argues that the trial court erred in excluding evidence of statements he made to his sister, Debbie Brooks, shortly after the altercation between him and Miller.

At trial, defendant attempted to argue self-defense as a defense to the felonious assault charge. As part of this defense, defendant sought to introduce statements he made to his sister on the morning of 15 November 1997, approximately twenty-five minutes after the altercation. On direct examination, Debbie Brooks testified that defendant returned home from the Miller residence a few minutes after 4:10 a.m. According to Brooks, defendant was in a "state of panic," "very upset emotionally," and "just like hysterical." Defendant was bleeding from the back of his head and had two cuts on his side. When Brooks was asked what defendant said upon his return home and whether defendant told her what had happened at the Miller residence, the State made objections which were sustained by the trial court. At the close of all the evidence, defendant made an offer of proof for the record that indicated Brooks would have testified that, upon his arrival in an emotionally upset condition, defendant told her that he had been in a fight with Tyrone Miller which started when defendant was hit on the back of the head. Defendant told Brooks that as he was hit on the head he heard a door slam, Tyrone Miller jumped on him, and the two men began fighting. Defendant told Brooks that he was injured and that he believed Miller was also injured. Defendant argues that his statements to his sister fall within the excited utterance exception to the hearsay rule, as they were a spontaneous reaction to a sufficiently startling event. We disagree.

STATE v. SAFRIT

[145 N.C. App. 541 (2001)]

North Carolina Rule of Evidence 803(2) provides that statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" are not excluded by the hearsay rule, "even though the declarant is available as a witness." N. C. Gen. Stat. § 8C-1, Rule 803(2) (2000). "It is well established that in order for an assertion to come within the parameters of this particular exception, 'there must be (1) a sufficiently startling experience suspending reflective thought and (2) a spontaneous reaction, not one resulting from reflection or fabrication.' " *State v. Thomas,* 119 N.C. App. 708, 712, 460 S.E.2d 349, 352, *disc. review denied,* 342 N.C. 196, 463 S.E.2d 248 (1995) (quoting *State v. Smith,* 315 N.C. 76, 86, 337 S.E.2d 833, 841 (1985). "While the period of time between the event and the statement is without a doubt a relevant factor, the element of time is not always material." *Id.* " '[T]he modern trend is to consider whether the delay in making the statement provided an opportunity to manufacture or fabricate the statement.' " *State v. Smith,* 315 N.C. 76, 87, 337 S.E.2d 833, 841 (1985) (citation omitted).

In the instant case, Brooks testified that defendant told her he had been involved in a fight during which he was hit on the back of the head, and that both he and the other combatant, Miller, had been injured. When defendant made this statement, his head was bleeding and he had two cuts on his side. These facts clearly indicate that defendant's statements were related to a sufficiently startling event or condition. However, we feel that defendant's statements lacked the spontaneity necessary to show that they were made free from reflection or fabrication.

Although Debbie Brooks testified that defendant was in a state of panic, was very emotionally upset, and was acting hysterical when he talked to her, Brooks also testified that defendant "knew exactly what he was saying." Further, the evidence shows that defendant's statements were made when he arrived home a few minutes after 4:10 a.m. The emergency telephone call reporting the altercation and Tyrone Miller's injuries was made at 3:47 a.m., as defendant was leaving the Miller residence. Therefore, defendant's statements to Debbie Brooks were made approximately twenty-five minutes after the altercation with Miller. During this lapse of time, defendant apparently fled from the Miller house in a van driven by Rick, who had also been involved in the altercation, and eventually returned to his home. The evidence does not disclose what else defendant and Rick did during this time period, where else the two men drove, whether they dis-

cussed the altercation during this time, or defendant's conduct or state of mind prior to returning home. We believe that these circumstances, coupled with defendant's clear motive for fabrication, *see State v. Deck*, 285 N.C. 209, 214, 203 S.E.2d 830, 834 (1974) (where the Supreme Court relied on the hearsay declarant's lack of a motive for fabrication in support of its determination that declarant's statements were properly admitted as spontaneous utterances), indicate a lapse of time sufficient to allow manufacture of a statement and show that defendant's statements to his sister lacked sufficient spontaneity. *See State v. Sidberry*, 337 N.C. 779, 448 S.E.2d 798 (1994) (within an hour of victim's death, sixteen-year-old defendant, distraught and on the verge of tears, told his aunt about the shooting; statement not admitted because defendant had time to manufacture statement and it was not made spontaneously). Therefore, we find that the trial court properly excluded Debbie Brooks' testimony on the grounds that it was inadmissible hearsay.

II.

**[2]** Defendant next argues that the trial court erred in not admitting into evidence the exculpatory statement made by defendant to Deputy Robert Rollins on 17 November 1997. Defendant contends the State opened the door to admission of this statement when it elicited testimony from Deputy Rollins about a later conversation he had with defendant, wherein defendant mentioned having a head injury and asked Deputy Rollins to take a look at it.

On direct examination, Deputy Rollins testified that he saw defendant within a couple of days of the stabbing of Tyrone Miller and that he did not notice any injuries to defendant at that time. On cross examination, Deputy Rollins testified that he interviewed defendant on 17 November 1997, and defendant signed a waiver of rights form and gave Deputy Rollins a recorded statement. When asked whether he recalled defendant mentioning a knot on the back of his head that he wanted Deputy Rollins to photograph, Deputy Rollins stated that he did not remember any mention of injuries. The following morning, on redirect examination, the State offered Deputy Rollins an opportunity to clarify his prior testimony, whereupon Rollins testified as follows:

A. Yes. There was an issue raised about whether I recalled any conversation between myself and Mr. Safrit during the interview when he raised an issue of having an injury. And when I testified

yesterday, I said I couldn't recall. And I didn't have any notes to that effect. And I do recall that there was conversation between me and Mr. Safrit at the close of the interview when I interviewed him.

And I do recall him making mention of having some type injury. And if I'm not mistaken, he was saying something about possibly having a head injury, and wanted me to look at it. And I did look at it, but I didn't note anything that I thought was significant or would be significant or would be sufficient injury in this case, or any noticeable injury. But I do recall having a conversation with Mr. Safrit about that.

Thereafter, on re-cross, defense counsel asked, "Officer Rollins, during that conversation when Gene Safrit was telling you about the head injury, did he tell you how he got that injury?" When the State's objection to this question was sustained, defendant contended that the State had opened the door to this inquiry. As part of his offer of proof at the close of all the evidence, defendant offered his entire recorded statement to Deputy Rollins. In that statement, defendant told Deputy Rollins that the fight between him and Miller started when someone hit defendant over the head with a hard object, and that he stabbed Miller in the heat of battle because he was scared. Defendant argues that by eliciting testimony that Deputy Rollins had a conversation with defendant about a head injury, the State opened the door for defendant to introduce his entire statement about what happened on 15 November 1997. We disagree.

It is well-settled law in North Carolina that "[w]here one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially." State v. Albert, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981). Under this doctrine, commonly referred to as "opening the door," the courts of this State have consistently held that if the State introduces into evidence part of a statement made by a defendant, the defendant is entitled to have the rest of the statement introduced, even if self-serving, so long as the statements are part of the same verbal transaction. State v. Vick, 341 N.C. 569, 578-79, 461 S.E.2d 655, 660 (1995); State v. Weeks, 322 N.C. 152, 167, 367 S.E.2d 895, 904 (1988). Thus, by simply introducing into evidence a statement made by a defendant, the State does not open the door for the introduction of another statement made by the defend-

ant at some other time during that day. *State v. Lovin*, 339 N.C. 695, 709, 454 S.E.2d 229, 237 (1995).

In the instant case, we do not believe the State "opened the door" to the introduction of defendant's entire recorded statement to Deputy Rollins. The testimony elicited by the State from Deputy Rollins was that he and defendant had a conversation at the conclusion of defendant's recorded interview, during which defendant mentioned having a head injury and asked Rollins to take a look at it. Defendant's statement about his head injury did not provide any additional details into what happened on the morning of 15 November 1997, and it was not recorded as part of defendant's earlier interview with Deputy Rollins. Therefore, we hold that defendant's remarks to Deputy Rollins concerning his head injury constituted a separate verbal transaction from defendant's prior recorded statement. Further, the record shows that the State made no attempt to offer into evidence any portion of defendant's recorded statement, or any testimony concerning its contents. Consequently, the State did not open the door to the admission of defendant's recorded statement.

Defendant, relying on *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 653, 656 (1981), and other cases, contends that the State, by eliciting testimony from Deputy Rollins as to a conversation with defendant concerning a possible head injury, offered "evidence as to a particular fact or transaction" which opened the door to cross examination by defendant in regard to the earlier statement given to Deputy Rollins. The "particular . . . transaction" to which the State opened the door was the conversation between defendant and Deputy Rollins that occurred after defendant's recorded interview had ended. It did not include defendant's entire recorded statement. *Compare Lovin*, 339 N.C. 695, 710, 454 S.E.2d 229, 237-38.

For the foregoing reasons, defendant's second assignment of error is overruled.

III.

**[3]** Defendant next argues that the trial court erred in denying his motion to dismiss the violent habitual felon indictment in 98 CRS 6730 on the grounds that the State was precluded from relitigating the allegations contained in the indictment because defendant had previously been found not guilty of being a violent habitual felon pursuant to an indictment alleging the same two prior violent felony convictions.

Subsequent to being indicted in the case *sub judice*, defendant was indicted on 13 July 1998 on a separate set of charges related to events that occurred on 24 May 1998. These separate charges against defendant also included an ancillary indictment charging defendant with violent habitual felon status ("98 CRS 10003"). The allegations in the indictment in 98 CRS 10003 are identical to the allegations in the violent habitual felon indictment in 98 CRS 6730. Defendant was tried on this subsequent set of charges prior to being tried on the charges in the instant case. Having been found guilty of assault with a deadly weapon inflicting serious injury, robbery with a dangerous weapon, felony larceny, and felony possession of stolen goods, defendant was tried for being a violent habitual felon in 98 CRS 10003. The jury returned a verdict of not guilty. Defendant argues that since he has previously been found not guilty of violent habitual felon status as charged in an indictment alleging he committed the same two prior violent felonies upon which the State charged him as a violent habitual felon in the instant case, the State is precluded from trying defendant as a violent habitual felon on the indictment in 98 CRS 6730. Defendant does not contend that he may never again be charged as a violent habitual felon, but merely that he cannot be charged and convicted of being a violent habitual felon based on the same combination of alleged prior violent felony convictions upon which a jury has previously found him not guilty of violent habitual felon status.

In support of his argument, defendant relies on the common law principles of res judicata and collateral estoppel, the North Carolina General Statutes, and the protections against double jeopardy contained in Article I, Sec. 19 of the North Carolina Constitution and the Fifth Amendment to the Federal Constitution. Concluding that this case is resolved by a straightforward application of the doctrine of collateral estoppel as it is applied to criminal cases pursuant to N.C. Gen. Stat. § 15A-954(7), we do not address defendant's constitutional arguments. However, we do begin with a brief discussion of the doctrine of res judicata, and its relevance to the case *sub judice*.

Under the doctrine of res judicata, also referred to as claim preclusion, "a final judgment on the merits in a prior action will prevent a second suit based on the same cause of action between the same parties or those in privity with them." *Thomas M. McInnis & Assoc., Inc. v. Hall*, 318 N.C. 421, 428, 349 S.E.2d 552, 556 (1986). Here, defendant does not argue that the State may never again charge

defendant as a violent habitual felon (i.e., bring a second suit on the same cause of action), but simply that the State cannot do so based on the same alleged prior violent felonies on which a jury has previously found defendant not guilty of violent habitual felon status. Therefore, the doctrine of res judicata does not bar the State in the instant case. However, we believe the companion doctrine of collateral estoppel does prevent the State from relitigating whether defendant is a violent habitual felon based on the same combination of prior violent felonies alleged in 98 CRS 10003.

The doctrine of collateral estoppel, also referred to as issue preclusion or estoppel by judgment, precludes relitigation of a fact, question, or right in issue

> when there has been a final judgment or decree, necessarily determining [the] fact, question or right in issue, rendered by a court of record and of competent jurisdiction, and there is a later suit involving an issue as to the identical fact, question or right theretofore determined, and involving identical parties or parties in privity with a party or parties to the prior suit.

*Masters v. Dunstan*, 256 N.C. 520, 524, 124 S.E.2d 574, 576 (1962). " ' . . . (W)hen a fact has been agreed upon or decided in a court of record, neither of the parties shall be allowed to call it in question, and have it tried over again at any time thereafter, so long as the judgment or decree stands unreversed.' " *Id.* at 523-24, 124 S.E.2d at 576 (citing *Humphrey v. Faison*, 247 N.C. 127, 100 S.E.2d 524 (1957) (citations omitted)). Simply put, "the doctrine of collateral estoppel operates, following a final judgment, to establish conclusively a matter of fact or law for the purposes of a later lawsuit on a different cause of action between the parties to the original action." E.H. Schopler, Annotation, *Modern Status of Doctrine of Res Judicata in Criminal Cases*, 9 A.L.R.3d 203, 214 (1966).

The application of the common law doctrine of collateral estoppel to criminal cases has been codified by N.C. Gen. Stat. § 15A-954(a)(7), which requires dismissal of the charges stated in a criminal pleading if it is determined that "[a]n issue of fact or law essential to a successful prosecution has been previously adjudicated in favor of defendant in a prior action between the parties." N.C. Gen. Stat. § 15A-954(a)(7) (2000); *State v. Parsons*, 92 N.C. App. 175, 177, 374 S.E.2d 123, 124 (1988), *disc. review denied*, 324 N.C. 340, 378 S.E.2d 805 (1989).

The requirements for the identity of issues to which collateral estoppel may be applied have been established by the North Carolina Supreme Court as follows:

> (1) the issues must be the same as those involved in the prior action, (2) the issues must have been raised and actually litigated in the prior action, (3) the issues must have been material and relevant to the disposition of the prior action, and (4) the determination of the issues in the prior action must have been necessary and essential to the resulting judgment.

*State v. Summers*, 351 N.C. 620, 623, 528 S.E.2d 17, 20 (2000) (quoting *King v. Grindstaff*, 284 N.C. 348, 358, 200 S.E.2d 799, 806 (1973)). Therefore, we must examine what issues were involved in the two respective actions. Specifically, we must determine what issues were fully litigated and finally decided by the jury's verdict of not guilty in 98 CRS 10003, and whether those issues were implicated in 98 CRS 6730.

Under N.C. Gen. Stat. § 14-7.7, "[a]ny person who has been convicted of two violent felonies in any federal court, in a court of this or any other state of the United States, or in a combination of these courts is declared to be a violent habitual felon." N.C. Gen. Stat. § 14-7.7 (2000). For purposes of N.C.G.S. § 14-7.7, "convicted" means that the person has been found guilty or has entered a plea of guilty or no contest to the violent felony charge, and judgment has been entered on said charge on or after 6 July 1967. *Id.* Therefore, in order to find a defendant guilty of being a violent habitual felon, the State must prove beyond a reasonable doubt that the defendant has been convicted of two prior violent felonies, with both convictions occurring on or after 6 July 1967. Consequently, the only issue for the jury to determine in a violent habitual felon proceeding is whether the defendant who has just been convicted of the underlying substantive felony is the same person as the individual the State alleges has two prior violent felony convictions since 6 July 1967.

In the prior action (98 CRS 10003), the jury was instructed that in order to find defendant guilty of being a violent habitual felon, the State had to prove two things beyond a reasonable doubt. First, that on 1 May 1973, in the Superior Court of Rowan County, North Carolina, defendant was convicted of the violent felony of armed robbery that was committed on 11 March 1973, in violation of the laws of

the State of North Carolina. Second, that on 8 December 1977, in the Superior Court of Caswell County, North Carolina, defendant was convicted of the violent felony of assault with a deadly weapon inflicting serious injury that was committed on 5 May 1977, in violation of the laws of the State of North Carolina. Having been so instructed, the jury returned a verdict of not guilty. In the instant case (98 CRS 6730), the jury received the exact same instructions and returned a guilty verdict.

The issue to be determined in the violent habitual felon proceeding in the instant case, whether defendant was convicted of armed robbery on 1 May 1973 in Rowan County Superior Court and convicted of assault with a deadly weapon inflicting serious injury on 8 December 1977 in Caswell County Superior Court, was raised and litigated in the prior action, was material and relevant to the disposition of the prior action, and was necessary and essential to the jury's not guilty verdict in the prior action. Therefore, we hold that the State was collaterally estopped from attempting to convict defendant of being a violent habitual felon based on the same two alleged prior violent felony convictions upon which a jury has already found defendant not guilty of violent habitual felon status. Consequently, the trial court erred in denying defendant's motion to dismiss the violent habitual felon indictment in 98 CRS 6730, and we remand for a new sentencing hearing for defendant.

IV.

Having found that the trial court erred in denying defendant's motion to dismiss the violent habitual felon indictment in the instant case, we need not address defendant's final assignment of error that the trial court erred in admitting into evidence the SBI fingerprint cards during the violent habitual felon proceeding.

In conclusion, we find no error in defendant's conviction of assault with a deadly weapon inflicting serious injury. However, we hold that the trial court erred in denying defendant's motion to dismiss the violent habitual felon indictment in 98 CRS 6730. Therefore, we reverse defendant's conviction of being a violent habitual felon and remand for a new sentencing hearing, at which defendant is to be sentenced for his conviction of assault with a deadly weapon inflicting serious injury, a Class E felony.

No error in 97 CRS 15635.

Reversed in 98 CRS 6730, and remanded for resentencing.

Judges GREENE and McGEE concur.