STATE OF NORTH CAROLINA v. CHRISTOPHER DEON GATTIS, DEFENDANT

No. COA03-452

(Filed 7 September 2004)

**1. Evidence— hearsay—medical treatment or diagnosis exception—excited utterance**

The trial court did not err in a first-degree murder, first-degree burglary, and assault with a deadly weapon case by excluding certain statements defendant made at the hospital and to his child's mother, because: (1) although defendant contends the State opened the door to an overheard statement by asking a police officer whether he ever heard defendant say anything about the victim, defendant failed to make this argument to the trial court; (2) the statement in a note that an emergency room nurse wrote at the time defendant was being examined by a physician regarding the gun going off accidentally during a fight is only relevant to fault and therefore does not fall within the scope of N.C.G.S. § 8C-1, Rule 803(4) relating to medical diagnosis or treatment; (3) by simply introducing into evidence a statement made by a defendant, the State does not open the door for the introduction of another statement made by defendant at some other time during that day; and (4) the statements defendant made to his child's mother were not excited utterances and established only the undisputed facts that defendant and the victim had an argument, that both were shot, and that defendant was bleeding.

1

STATE v. GATTIS

[166 N.C. App. 1 (2004)]

**2. Criminal Law— closing arguments—defense of accident**

The trial court did not erroneously deprive defendant of his right to present the defense of accident in a first-degree murder, first-degree burglary, and assault with a deadly weapon case by prohibiting defendant from using the word "accidentally" in his closing argument, because: (1) evidence does not raise the defense of accident where defendant was not engaged in lawful conduct when the killing occurred; and (2) to the extent defendant contends the trial court's ruling precluded him from negating premeditation and deliberation, the closing argument reveals otherwise.

**3. Criminal Law— trial court's remarks—failure to show prejudice**

Defendant was not deprived of a fair and impartial trial by certain remarks of the judge in a first-degree murder, first-degree burglary, and assault with a deadly weapon case, because: (1) defendant failed to refer the Court of Appeals to any particular statement of the trial court that he is challenging regarding the trial court's instruction to the jurors to view the exhibits quickly, and thus, has failed to properly present this question for review; and (2) the trial court did not err by making credibility findings outside the presence of the jury.

**4. Evidence— hearsay—state of mind exception**

The trial court did not err in a first-degree murder, first-degree burglary, and assault with a deadly weapon case by admitting under N.C.G.S. § 8C-1, Rule 803(3) statements that the victim made to seven individuals regarding her relationship with the victim in the period before her death and regarding conversations she had with defendant on the day of her death, because: (1) in addition to bearing directly on the victim's relationship with defendant at the time she was killed, the evidence related to the State's contention regarding defendant's motive in killing the victim; (2) the evidence refuted defendant's contention that defendant had an ongoing relationship with the victim and went to her house to visit with her and not with any intention of harming her; and (3) the victim's statements on 23 March 2001 were directly pertinent to the confrontation that led to her death that evening.

**5. Jury— peremptory challenges—*Batson* motion**

The trial court did not err in a first-degree murder, first-degree burglary, and assault with a deadly weapon case by deny-

ing defendant's *Batson* motion made in response to the State's peremptory strike of the first African-American juror to be questioned, because: (1) although the trial court improperly indicated that a pattern must be shown to establish a violation of *Batson*, the trial court gave defendant an opportunity to present a prima facie case pursuant to *Batson*; and (2) without any contention that the jury pool was selected in a discriminatory fashion, defendant's assertion that the limited number of African-Americans in the pool yet to be questioned supported a claim of race discrimination was inadequate to establish a prima facie case under *Batson*.

**6. Homicide— first-degree murder—short-form indictment— constitutionality**

The short-form indictment used to charge defendant with first-degree murder was constitutional.

Appeal by defendant from judgments entered 3 May 2002 by Judge J.B. Allen, Jr. in Alamance County Superior Court. Heard in the Court of Appeals 17 March 2004.

*Attorney General Roy Cooper, by Assistant Attorney General John G. Barnwell, for the State.*

*Nora Henry Hargrove, for defendant-appellant.*

GEER, Judge.

Defendant Christopher Deon Gattis appeals from his conviction of first degree murder in the shooting death of his estranged wife, Charlotte Gattis, and of related charges of first degree burglary and assault with a deadly weapon. Defendant contends primarily that the trial court improperly excluded statements he made after the shooting and improperly admitted testimony of hearsay statements by Ms. Gattis. We hold that the trial court's evidentiary rulings did not constitute prejudicial error and that defendant has not identified any other error warranting a new trial.

Facts

The State's evidence tended to show the following. Defendant and Ms. Gattis were separated and living apart following a stormy marriage. Ms. Gattis and her daughter from a previous relationship had rented an apartment and Ms. Gattis had begun dating another

man, Jason Stover. Defendant, however, hoped to persuade Ms. Gattis to return to him.

On 23 March 2001, Ms. Gattis' daughter was spending the night at someone else's house and Mr. Stover came over to Ms. Gattis' apartment at 11:40 p.m. While they were watching television, they heard a noise like a "key to glass." Mr. Stover tried to determine where the sound was coming from and saw a person standing outside the apartment's glass patio doors. Ms. Gattis recognized defendant and immediately called 911. As she did, she called out, "Chris I'm calling 911. . . . I'm calling the police." Defendant repeatedly demanded that she open the door and let him in.

At some point, while defendant pressed against the door, the door came open and defendant fell into the kitchen, holding a gun. Defendant and Mr. Stover began to wrestle over the gun. When defendant pointed his gun directly at Mr. Stover, Mr. Stover turned and ran outside. As he ran, he heard defendant yell "[y]ou're going to die," followed by a gunshot.

Defendant's gun did not have a magazine and had to be loaded by hand, one bullet at a time. After defendant took his first shot, and while Ms. Gattis was talking to the 911 operator, defendant loaded another bullet into the gun. Defendant then struggled with Ms. Gattis, placing her in a headlock with his left arm. The struggle and two shots were recorded on the 911 telephone line.

At defendant's trial, the State introduced a recording of the 911 tape. The jury heard the following:

DISPATCHER: 911.

FEMALE CALLER: Yes, I need a police at Glenwood Apartments.

DISPATCHER: Let me connect you. Hold on.

(Phone rings.)

(Gunshot heard.)

FEMALE CALLER: I need a police at Glenwood Apartment, Apartment 81.

DISPATCHER: Burlington Police and Fire, Curtis. What's the problem?

FEMALE CALLER: My husband shooting at somebody.

STATE v. GATTIS

[166 N.C. App. 1 (2004)]

DISPATCHER: He's shooting at somebody?

FEMALE CALLER: Yes.

DISPATCHER: Who's he shooting at?

FEMALE CALLER: Please get them here.

DISPATCHER: Ma'am, I'm sending them over there. Can you tell me some information [?]

FEMALE CALLER: Ma'am, his name is Chris Gattis. Chris Gattis.

DISPATCHER: Who is Chris Gattis? Ma'am?

FEMALE CALLER: Chris.

MALE VOICE: I'm going to kill you right here.

FEMALE CALLER: Chris. Chris. (Screaming.) Oh, my God. Oh, my God. Chris, no. Not my baby. Where's my baby? Where's my baby?

DISPATCHER: Ma'am.

FEMALE CALLER: Where's my baby? Where's my baby? Where's my baby? Where's my baby?

DISPATCHER: Ma'am.

FEMALE CALLER: Oh, my God.

(UNINTELLIGIBLE)

FEMALE CALLER: Where's my baby? Where's my baby? Where's my baby? Where's my baby?

MALE VOICE: Kill you today.

FEMALE CALLER: Please don't. Please don't. My little girl.

DISPATCHER: Ma'am.

FEMALE CALLER: Oh, God. I don't want you to go to jail. I don't want you to go to jail. I don't want you to go to jail.

(MALE VOICE HEARD)

FEMALE CALLER: I don't want you to go to jail.

DISPATCHER: Ma'am.

POLICE: Apartment 81. (UNINTELLIGIBLE)

DISPATCHER: Ma'am. Hello.

POLICE: I heard the shot.

FEMALE CALLER: Don't kill me. Don't kill me. Chris, don't kill me. No, no, don't kill me. Look at me. Chris, don't kill me. Chris. Chris. (Screaming.) No, don't kill me. Don't kill me.

(Gunshot heard.)

POLICE: At Chapel Hill and Mebane.

DISPATCHER: I had a female screaming on open line. Sound like another shot. She's not screaming anymore.

POLICE: (UNINTELLIGIBLE)

DISPATCHER: Hello. They are on their way. I already called them. Hello. She ain't screaming no more. I don't know if they slammed the phone down or he shot her.

POLICE: Mebane and Maple.

DISPATCHER: Hello.

POLICE: (UNINTELLIGIBLE)

Officer Ward of the Burlington Police Department found Ms. Gattis dead in one of the bedrooms. An autopsy revealed that she died from a single gunshot wound to the right side of her face. The muzzle of the gun had been approximately half an inch or less from Ms. Gattis' face when the gun was fired.

Defendant fled the apartment before the police arrived. He went to a telephone booth, where he called Ms. Gattis' mother and told her, "Charlotte is dead. I shot her. I killed her." He said he was sorry. He also called Jeanette Florence, the mother of his son. Ms. Florence picked up defendant in her car and drove him to a hospital because he had a bullet wound in his left arm. Blood drops were ultimately found near the pay phone, along with two bullets and a trigger guard.

Defendant arrived at the emergency room at about 2:30 a.m. on 24 March 2001 and told a police officer there, "I'm the one y'all are looking for." Defendant was treated for his bullet wound, which was described as having an entrance wound on the underside and an exit wound on the top side of his arm. Defendant's clothes, which were stained with what appeared to be dried blood, were taken into evidence. A bullet was found in one pocket.

STATE v. GATTIS

[166 N.C. App. 1 (2004)]

During the afternoon of 24 March 2001, defendant gave a statement to the police. Defendant said he did not want his marriage to Ms. Gattis to end and that he suspected she was seeing Mr. Stover. Defendant told police he went to the apartment to confirm his suspicions, slid open the back patio door, and then returned to his car to get his 9-millimeter gun. He said when he returned, he heard Ms. Gattis and Mr. Stover laughing inside and loaded his gun. He told the police that he had planned to break into the back door with a screwdriver, but found the door open. According to defendant, he entered the apartment, briefly struggled with Mr. Stover, fired at him as he ran away, and reloaded his gun. In describing his struggle with Ms. Gattis, defendant claimed, "I had her head under my left arm, and she had her hand on the gun. The gun was about one foot from her head. The gun went off and she fell to the ground." He also reported that when he reached Ms. Florence on the telephone, "I told her that Charlotte and I had fought over the gun and it went off."

Defendant was indicted for first degree murder, first degree burglary, and assault with a deadly weapon with intent to kill. The State sought to convict defendant of first degree murder predicated both on malice, premeditation, and deliberation and on the felony murder rule. The jury found defendant guilty of first degree murder under both theories. He was also found guilty of first degree burglary and assault on Mr. Stover with a deadly weapon. The jury did not find that defendant intended to kill Mr. Stover. After the sentencing phase, the jury recommended life imprisonment. The trial court imposed a life sentence without parole for the first degree murder conviction, a consecutive sentence of 103 months to 133 months for first degree burglary, and a third consecutive sentence of 150 days for assault with a deadly weapon.

I. Defendant's Hearsay Statements.

[1] Defendant first contends that the trial court erred in excluding certain statements that he made at the hospital and to Ms. Florence. Since these statements are out-of-court statements offered for the truth of the matter asserted, they constitute hearsay and are inadmissible unless they fall within one of the exceptions to the hearsay rule. N.C. Gen. Stat. §§ 8C-1, Rules 801(c), 802 (2003). We examine each of defendant's statements separately.

A. *Statement Overheard by Police Officer Marshall.*

Defendant argues that the trial court erred in excluding the testimony of Officer Marshall, the police officer at the emergency room,

about statements Marshall overheard defendant make to a physician about the cause of defendant's bullet wound. Defendant's offer of proof indicated that Marshall would testify that he heard defendant say that he had gotten into a fight with his wife and that his written report stated that defendant said "he got into an altercation with his wife in which the gun went off."

Defendant contends on appeal that the State "opened the door" to this overheard statement by asking Marshall, "Did you ever hear him say anything about Charlotte Gattis?" Our review of the record reveals that defendant did not argue this theory of admissibility to the trial court. Rather, defendant argued at trial that the statement was admissible under Rule 803(2) (2003) (the "excited utterance" exception), under Rule 803(4) (2003) (statements made for purposes of medical treatment or diagnosis), and based on the State's introduction of defendant's statement taken on the afternoon of 24 March 2001.

Our Supreme Court "has long held that where a theory argued on appeal was not raised before the trial court, 'the law does not permit parties to swap horses between courts in order to get a better mount' " in the appellate courts. *State v. Sharpe*, 344 N.C. 190, 194, 473 S.E.2d 3, 5 (1996) (quoting *Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934)). We will not, therefore, address defendant's theory that the State opened the door. Since defendant does not make any other argument on appeal regarding this statement, we overrule this as-signment of error.

B. *Statement Recorded by the Nurse.*

Defendant also sought to introduce a note that emergency room nurse Denise Jones wrote at the time defendant was being examined by a physician: "Patient states alleged argument with spouse, wrestling with a 9 millimeter gun was accidentally discharged." Defendant first argues that the statement contained in the note was admissible under Rule 803(4) as a statement made for medical treatment or diagnosis.

Rule 803(4) excepts from the hearsay rule "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." N.C. Gen. Stat. § 8C-1, Rule 803(4). The Supreme Court has held that statements

qualify for admission under Rule 803(4) only if (1) "the declarant intended to make the statements at issue in order to obtain medical diagnosis or treatment[;]" and (2) "the declarant's statements were reasonably pertinent to medical diagnosis or treatment." *State v. Hinnant*, 351 N.C. 277, 289, 523 S.E.2d 663, 670-71 (2000). Because we hold that defendant's statements were not reasonably pertinent to diagnosis or treatment, we need not address whether defendant had the requisite intent.

Defendant contends that the doctor needed to know that defendant's wound was a bullet hole because of the possibility that a bullet was still lodged in defendant's body. Although the fact that defendant had suffered a gunshot wound would be pertinent to treatment, both Ms. Jones and the physician testified that the manner in which the bullet wound occurred—such as a gun accidentally discharging during an altercation—was not pertinent to how the wound was treated. The commentary to Rule 803(4) specifically provides that "[s]tatements as to fault would not ordinarily qualify under this latter language." N.C. Gen. Stat. § 8C-1, Rule 803(4), Commentary. Since the statement regarding the gun going off accidentally during a fight is relevant only to fault, it does not fall within the scope of Rule 803(4). *See, e.g., Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 277-78 (5th Cir. 1991) (when doctors testified that they only needed to know that plaintiff twisted his ankle and did not need to know how it occurred, plaintiff's statements regarding how accident occurred were inadmissible under Fed. R. Evid. 803(4)).

Defendant also argues that the nurse's note should have been admitted because the statement made in the early morning hours corroborated his statement to police made later in the afternoon. Defendant relies on the principle that "if the State introduces into evidence part of a statement made by a defendant, the defendant is entitled to have the rest of the statement introduced, even if self-serving, so long as the statements are part of the same verbal transaction." *State v. Safrit*, 145 N.C. App. 541, 549, 551 S.E.2d 516, 522 (2001). Nevertheless, "by simply introducing into evidence a statement made by a defendant, the State does not open the door for the introduction of another statement made by the defendant at some other time during that day." *Id.* at 549-50, 551 S.E.2d at 522. Since defendant's remark to the doctor and nurse was not part of the statement made to the police and, in fact, was made hours earlier, the State did not open the door to its admission.

C. *Statements to Ms. Florence.*

Defendant next contends that the trial court erred in excluding statements he made to Ms. Florence while calling her from a pay phone after the shooting and while she drove him to the hospital. On *voir dire*, Ms. Florence testified that defendant told her on the phone that "Charlotte had been shot, that he had been shot and that he was bleeding real bad"; that "they had got into it" and "while they were getting into it, that the gun had went off, and that she had got shot and that he had got shot." Ms. Florence testified that while she drove defendant to the hospital, he told her that "they got into it," but did not provide further details. Ms. Florence further testified that defendant "just said that he, that he got shot and she got shot while they were getting into it."

Defendant contends the statements were admissible under Rule 803(2), which excludes from the hearsay rule "excited utterances," defined as "[a] statement relating to a startling event or condition made while declarant was under the stress of excitement caused by the event or condition." The trial court declined to admit the statements on the ground that defendant made them after he had "ample time to reflect upon his, his prior activities." Even assuming, without deciding, that it was error to exclude this evidence, any error was harmless.

N.C. Gen. Stat. § 15A-1443(a) provides that, "[a] defendant is prejudiced by errors relating to rights . . . when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial . . . ." N.C. Gen. Stat. § 15A-1443(a) (2003). The statements that defendant made to Ms. Florence establish only the undisputed facts that he and Ms. Gattis had an argument, that both of them were shot, and that defendant was bleeding. With the exception of the statement that "while they were getting into it, that the gun had went off," the statements do not specifically advance defendant's defense that his shooting of Ms. Gattis was unintended. In light of the 911 tape recording, defendant's statement to police, and other overwhelming evidence of guilt, there is no reasonable possibility that inclusion of this testimony would have altered the outcome of the trial. *State v. Lloyd*, 321 N.C. 301, 310, 364 S.E.2d 316, 322 (exclusion of defendant's statements that he found the body was harmless in light of "overwhelming" circumstantial evidence that he murdered the victim), *vacated on other grounds*, 488 U.S. 807, 102 L. Ed. 2d 181, 109 S. Ct. 38 (1988).

## II. Prohibition Against Arguing Accident.

[2] Defendant contends he was wrongfully deprived of his right to present the defense of accident when the trial court prohibited him from using the word "accidentally" in his closing argument. During closing arguments, defense counsel stated:

> I would submit to you, the medical examiner said her hands could have been on the gun. I submit to you that's consistent with Mr. Gattis's statement, that they were wrestling over the gun. And yes, the trigger pull on that gun is a certain amount. But she was pulling the gun. He was holding the gun, and that's why the gun accidentally went off.

The trial court sustained the State's objection on the grounds that defendant had not requested an instruction on accident and, in any event, the accident defense was not available given the evidence. The court did not give any instruction to the jury about use of the word "accident," but directed counsel not to argue accident further.

The law is clear that "evidence does not raise the defense of accident where the defendant was not engaged in lawful conduct when the killing occurred." *State v. Riddick*, 340 N.C. 338, 342, 457 S.E.2d 728, 731 (1995). In *Riddick*, although the defendant claimed his gun went off accidentally when he was startled by a loud noise, the Supreme Court affirmed the trial court's refusal to instruct as to accident because the evidence was undisputed "that the defendant sought out the victim, that the defendant intentionally confronted the victim with a loaded firearm, that the defendant assaulted the victim, and that the gun was in the defendant's hand when two bullets, one of which entered the victim's body, were fired from it." *Id.* at 343, 457 S.E.2d at 731.

The undisputed evidence here shows that defendant was not engaged in lawful conduct when he shot Ms. Gattis. Defendant unlawfully entered her home, with a loaded gun, threatened both Ms. Gattis and Mr. Stover with the gun, unlawfully fired the gun and reloaded, and—by his own admission—struck Ms. Gattis in the head with the gun before the fatal bullet was fired. As a result, the defense of accident was unavailable to defendant. *See also State v. Lytton*, 319 N.C. 422, 426, 355 S.E.2d 485, 487 (1987) (undisputed evidence that established at least the crime of involuntary manslaughter precluded the defense of accident). Since defendant was not entitled to rely upon the defense of accident, the trial court did not err in barring him from arguing accident to the jury.

STATE v. GATTIS

[166 N.C. App. 1 (2004)]

We further note that to the extent defendant contends the trial court's ruling precluded him from negating premeditation and deliberation, the closing argument reveals otherwise. Defense counsel argued extensively that the defendant lacked premeditation and deliberation and that the shooting was unintentional. Defendant was simply precluded from using the word "accidentally" a second time.

## III. Remarks of the Trial Court.

**[3]** Defendant contends he was deprived of a fair and impartial trial tribunal by certain remarks of the judge. Defendant first argues that the trial court instructed the jurors to view the exhibits quickly, thereby conveying an impression of "impatience and a negative opinion of [defendant's] case." Rule 10(c)(1) of the Rules of Appellate Procedure provides that "[a]n assignment of error is sufficient if it directs the attention of the appellate court to the particular error about which the question is made, with clear and specific record or transcript references." In the assignment of error directed to this issue, defendant cites only the portion of the transcript in which defense counsel "object[ed] to the Court having said to the jury on several occasions they need to see things quickly and we're going to move the trial along." Since defendant has not referred this Court to any particular statement of the trial court that he is challenging, he has not properly presented this question for review.

Defendant next argues that the judge expressed bias in stating that "somebody has not told the truth" about whether defendant signed a waiver of his rights before giving a statement to police. The actual assignment of error cited for this argument contends that the trial court erred in denying defendant's motion to recuse the trial judge based on this statement. In his appellate brief, however, defendant argues that the statement violated N.C. Gen. Stat. §§ 15A-1222 and -1232.

The record shows that the jury was not present when the judge made this statement. This statement was one of several findings of fact the judge made following an evidentiary hearing outside the presence of the jury regarding defendant's objection to the admission of defendant's statement to the police on the grounds that defendant did not sign a *Miranda* waiver. The trial court found that defendant's claim that he did not sign the waiver was not credible and allowed the admission of the statement.

N.C. Gen. Stat. § 15A-1222 (2003) prohibits the judge from expressing "during any stage of the trial[] any opinion in the presence

of the jury on any question of fact to be decided by the jury." N.C. Gen. Stat. § 15A-1232 (2003) prohibits the judge from expressing an opinion regarding whether a fact has been proven while "instructing the jury[.]" As these statutes make clear, the prohibition is inapplicable when, as here, the jury is not present. *See State v. Rogers*, 316 N.C. 203, 220, 341 S.E.2d 713, 723 (1986) ("N.C.G.S. § 15A-1222, which forbids the expression of an opinion by the trial court, is inapplicable when the jury is not present during the questioning."), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177, 118 S. Ct. 248 (1997) and *State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). Defendant's objection—essentially a motion to suppress—required the trial court to determine credibility on a specific issue. The trial court did not err in making credibility findings outside the presence of the jury.

IV. Hearsay Statements of the Deceased.

[4] Defendant next contends the trial court erred in admitting under Rule 803(3) statements that Ms. Gattis made to seven individuals. Under Rule 803(3), " '[e]vidence tending to show the victim's state of mind is admissible so long as the victim's state of mind is relevant to the case at hand.' " *State v. Bishop*, 346 N.C. 365, 379, 488 S.E.2d 769, 776 (1997) (quoting *State v. Stager*, 329 N.C. 278, 314, 406 S.E.2d 876, 897 (1991)). A victim's state of mind is relevant "if it bears directly on the victim's relationship with the defendant at the time the victim was killed." *Id.*

We first note that defendant has not properly presented this issue for review. In his assignment of error and in his brief, defendant has specified only the portions of the transcript relating to the trial court's oral rulings and, contrary to N.C.R. App. P. 10(c), has not identified any specific portion of actual testimony that is inadmissible. We cannot, therefore, determine precisely which questions and answers are being challenged on appeal. Our review of the rulings does not, however, reveal any error.

The rulings identified by defendant allowed the State to elicit testimony from friends and family members as to (1) statements made by Ms. Gattis regarding her relationship with defendant in the period before her death; and (2) statements made by Ms. Gattis regarding conversations she had with defendant on the day of her death. Both categories of statements were admissible.

The State offered testimony that Ms. Gattis had told a number of people that her marriage with defendant was over, that she had no

desire to reconcile despite defendant's efforts to persuade her to do so, and that her decision to end the marriage was based on defendant's sexual relationships with other women and their disagreements over money. In addition to bearing directly on Ms. Gattis' relationship with defendant at the time she was killed, this evidence related to the State's contention regarding defendant's motive in killing Ms. Gattis: her refusal to reconcile and her involvement with another man. Moreover, it also tended to refute defendant's contention, asserted in defense counsel's opening statement, that defendant had an ongoing relationship with Ms. Gattis and went to her house to visit with her and not with any intention of harming her. *See State v. Carroll*, 356 N.C. 526, 543, 573 S.E.2d 899, 910 (2002) (victim's hearsay statements that she wanted defendant to move out because she was tired of him taking her money to buy drugs were admissible under Rule 803(3) because the statements "indicate difficulties in the relationship prior to the murder"), *cert. denied*, 539 U.S. 949, 156 L. Ed. 2d 640, 123 S. Ct. 2624 (2003); *Bishop*, 346 N.C. at 380, 488 S.E.2d at 776 (victim's hearsay statements that defendant was in debt to the victim, defendant was refusing to repay her, and the victim was insisting on repayment "were relevant to show a motive for the killing" and, therefore, were admissible under Rule 803(3)); *State v. Westbrooks*, 345 N.C. 43, 59, 478 S.E.2d 483, 493 (1996) (statements by victim reflecting concern about his marriage and his wife's handling of finances were admissible under Rule 803(3) as bearing directly on the nature of the relationship between the victim and the defendant and as relevant to the issue of a motive for the victim's murder). Ms. Gattis' statements were, therefore, properly admitted by the trial court.

The State also offered testimony regarding conversations that Ms. Gattis had with others in which she described events with defendant earlier on the day of her death, including Ms. Gattis' statement that she told defendant she did not wish to reconcile, causing him to become upset, and her concern that he had a gun. Our Supreme Court, in *State v. Corbett*, 339 N.C. 313, 332, 451 S.E.2d 252, 262 (1994), stated that a victim's state of mind is relevant if "it related directly to circumstances giving rise to a potential confrontation with defendant on the day she was murdered." Under *Corbett*, Ms. Gattis' statements on 23 March 2001 were admissible because they were directly pertinent to the confrontation that led to her death that evening. *See also State v. McLemore*, 343 N.C. 240, 245-46, 470 S.E.2d 2, 5 (1996) (victim's statement shortly before she was killed that she was going to "lay down the law" admissible as re-

lating directly to circumstances giving rise to potential confrontation with the defendant).

## V. *Batson* Challenge.

**[5]** Defendant contends the trial court improperly denied his *Batson* motion made in response to the State's peremptory strike of the first African-American juror to be questioned. We disagree.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the North Carolina Constitution forbid the use of peremptory challenges for a racially discriminatory purpose. *State v. Barden*, 356 N.C. 316, 342, 572 S.E.2d 108, 126 (2002), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074, 123 S. Ct. 2087 (2003). In *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the United States Supreme Court set out a three-part test to determine whether a prosecutor has impermissibly used peremptory challenges to excuse prospective jurors on the basis of race. *Id.* at 89, 90 L. Ed. 2d at 83, 106 S. Ct. at 1712. Under this test, the defendant must first make a *prima facie* showing that the State exercised a peremptory challenge on the basis of race. *Id.* If such a showing is made, the prosecutor is required to offer a facially valid and race-neutral rationale for the peremptory challenge. *Id.* At that point, the trial court must determine whether the defendant has carried his ultimate burden of proving purposeful discrimination. *Id.*

The issue of discrimination is a question of fact and the trial court's ruling will be upheld unless the appellate court is convinced that the trial court's decision is "clearly erroneous[.]" *State v. McCord*, 140 N.C. App. 634, 652, 538 S.E.2d 633, 644 (2000), *disc. review denied*, 353 N.C. 392, 547 S.E.2d 34 (2001). When the trial court rules that a defendant has failed to make the required *prima facie* showing of race discrimination, our review is limited to whether the trial court erred in making that preliminary determination regardless of whether the State has offered reasons for its exercise of the peremptory challenges. *Barden*, 356 N.C. at 343, 572 S.E.2d at 127.

In this case, the juror was on the first panel questioned during *voir dire* and was the first juror for whom the prosecutor used a peremptory strike. The record shows the following exchange:

STATE: State's going to excuse [the prospective juror].

COURT: Excuse him? [court excuses prospective juror].

. . . .

DEFENSE:  Your Honor.

COURT:  That's the first one. It's not a pattern yet.

DEFENSE:  All right.

COURT:  I'll be glad to hear you.

DEFENSE:  I was just going to say because there are only a few blacks on the panel as I observed it.

. . . .

STATE: I can state a reason. He's 19 and he's unemployed. My experience in death penalty cases, this is my eleventh one, that teen-agers aren't going to give real consideration to the death penalty.

COURT: Well, I don't think I have to rule at this point. However, I'm very cautious about the, the federal case on that; and I won't let the State and I won't let the defendant be excusing anyone for, because of race. But this is the very first one, Mr. Collins; and I think that any objection you have at this point is over-ruled.

To the extent the trial court's remarks indicate a belief that a pattern must be shown to establish a violation of *Batson*, the trial court was incorrect. The excusal of even a single juror for a racially discriminatory reason is impermissible. *State v. Robbins*, 319 N.C. 465, 491, 356 S.E.2d 279, 295, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226, 108 S. Ct. 269 (1987) ("Even a single act of invidious discrimination may form the basis for an equal protection violation."). Nevertheless, the trial court's statement that "I'll be glad to hear you" indicates that he gave defendant an opportunity to present a *prima facie* case pursuant to *Batson*.

Although the first step of the *Batson* analysis is not intended to be a high hurdle for defendants to cross, *Barden*, 356 N.C. at 345, 572 S.E.2d at 128, a defendant must make some showing suggestive of race discrimination. The only reason articulated by defendant in this case to support a claim of race discrimination was the limited number of African-Americans in the pool yet to be questioned. Without any contention that the jury pool was selected in a discriminatory fashion, that assertion is little more than a recognition that the excused juror was African-American and, standing alone, is inadequate to establish a *prima facie* case under *Batson*. *State v. Ross*, 338

N.C. 280, 286, 449 S.E.2d 556, 562 (1994) ("Defendant's unsubstantiated allegation that a prospective black juror was excluded from the jury on the basis of race is not sufficient to establish a prima facie case of racial discrimination."). We hold that the trial court's decision that defendant failed to present a *prima facie* case under *Batson* was not clearly erroneous.

VI. Short-form Indictment.

**[6]** Finally, defendant argues that the short-form indictment charging him with first degree murder failed to specify that he killed Ms. Gattis with premeditation, deliberation, or a specific intent to kill. Based on the Supreme Court's ruling in *State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593, *cert. denied*, 539 U.S. 985, 156 L. Ed. 2d 702, 124 S. Ct. 43 (2003), this assignment of error is overruled.

No error.

Chief Judge MARTIN and Judge HUDSON concur.